Ronald F. BERKLEY, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

No. 98–943C.

United States Court of Federal Claims.

Feb. 20, 2004.

Barry P. Steinberg, Washington, D.C., for the plaintiffs. William A. Aileo, Springville, Pennsylvania, of counsel.

Jonathan Reid Prouty, Commercial Litigation Branch; James M. Kinsella, Deputy Di-

rector; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, for the defendant. Major Ira Perkins, Office of The Judge Advocate General, United States Air Force, of counsel.

## OPINION

HORN, Judge.

This matter comes before the court on the plaintiffs' motion for approval of the Settlement Agreement between the United States and approximately 620 former junior officers who held reserve commissions in the United States Air Force. Within four days of the filing of this opinion, the parties shall file a joint status report informing the court of the exact number and names of those plaintiffs who remain in the class. After further proceedings in the trial court and lengthy negotiations between the parties, following remand from the United States Court of Appeals for the Federal Circuit, *Berkley v. United States*, 287 F.3d 1076, 1091 (Fed.Cir. 2002), this court preliminarily approved the parties' Settlement Agreement. Following receipt of filings from both parties, the court conducted a fairness hearing. Counsel for both parties made presentations and any individual plaintiff who wished to address the court also was given an opportunity to do so. Numerous plaintiffs addressed the court and comments were received in writing, both before and after the hearing. Following the hearing, the parties also filed supplemental memoranda. After carefully reviewing the filings submitted by the parties and the individual plaintiffs, and after reviewing the evidence adduced at the hearing, for the reasons set forth below, the Settlement Agreement between the parties is approved.

## FINDINGS OF FACT

For a full recitation of the facts, see *Berkley v. United States*, 48 Fed.Cl. 361 (2000).

1. On November 5, 1999, this court certified a class in the above captioned case pursuant to Rule 23 of the Rules of the United States Court of

A brief review of the most relevant facts is set forth below.

In July, 1992, due to congressionally mandated reductions in the manpower levels of the armed forces, the Secretary of the Air Force established the Fiscal Year 1993 Reduction in Force Board (FY 93 RIF Board) to select officers in the Air Force for involuntary separation in Fiscal Year 1993. The Secretary issued a Memorandum of Instruction (the Instruction) to provide guidance to the Board regarding how to select officers for involuntary separation. Certain language in the Instruction is the focus of plaintiffs' challenge.

Plaintiffs are a certified, opt-in class consisting of approximately 620 former junior officers who held reserve commissions in the United States Air Force.[1] Each plaintiff was considered and selected for involuntary separation from the United States Air Force by the FY93 RIF Board. Plaintiffs claim that, based on the Instruction issued by the Secretary of the Air Force, the FY 93 RIF Board violated their rights to equal protection under the Fifth Amendment of the United States Constitution by suggesting that prior opportunities in the Air Force for women and minorities could be taken into account when considering the records of officers subject to the FY 93 RIF Board. Plaintiffs cite paragraph 7 of the Instruction as the primary source of their allegations regarding race and gender. Paragraph 7 states in relevant part:

Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective. The Board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as

Federal Claims (RCFC). *See Berkley v. United States*, 45 Fed.Cl. 224 (1999).

compared to the selection rates for all officers considered by the Board.

The Instruction also contained information regarding year group quotas. These quotas referred only to the number of officers per year group who needed to be selected for separation from the Air Force. The year group quotas are the only quotas referenced in the Instruction and do not relate to the selection of women, racial minorities or any individual officers in the RIF process.

This court issued a decision on December 19, 2000, granting judgment in favor of the government. *See id.* at 379. The court found that the Instruction did not include a racial or gender classification bestowing a benefit or burden based on that classification. The court, therefore, found it unnecessary to analyze the case under the heightened scrutiny standards used to evaluate actions by the government involving racial or gender classifications. Having found that the Secretary's Memorandum of Instruction was rationally related to the legitimate governmental interest of establishing the proper, total composition of Air Force personnel, the court held that plaintiffs were not denied equal protection under the law. *See id.* Plaintiffs appealed.

The United States Court of Appeals for the Federal Circuit reversed and remanded. *See Berkley v. United States,* 287 F.3d at 1091. The Federal Circuit found that the challenged Instruction contained racial and gender-based classifications and required disparate treatment of officers based on these classifications. *Id.* at 1088. Consequently, the case was remanded for evaluation under the respective heightened scrutiny standards for race and gender. *Id.* at 1091.

Upon remand, the parties entered settlement negotiations. After lengthy negotiations, the parties reached agreement, as discussed below. The major terms of the Settlement Agreement give each plaintiff options from which to choose.

### The Lump Sum Payment Option

The government has agreed to make a lump sum payment of $30,000.00 to each class member, less class counsels' costs, expenses and attorney fees. Settlement Agreement (cited hereinafter as Sett. Agr.) ¶ 4(b). Class counsels' costs, expenses and attorney fees are set at $2,100.00 per plaintiff, which translates to seven percent of the lump sum payment value. Sett. Agr. ¶ 4(r). The lump sum payment is not subject to offsets for separation pay, retirement pay or income earned subsequent to the FY 93 RIF.

### The Selection Board Option

In lieu of the lump sum payment, class members may opt to have their military service records submitted to a Selection Board. Sett. Agr. ¶ 4(c). Plaintiffs who request access to their records will be given access at least forty-five days prior to convening the Board, and may request corrections to their records pursuant to existing procedures. Sett. Agr. ¶ 4(c). Pursuant to procedures set forth in the Agreement, the Board will determine anew if a class member should be selected for retention. Sett. Agr. ¶ 4(c). If the Selection Board does not select a class member for retention, he or she will receive a lump sum payment equal to $5,000.00, less costs, expenses and attorney fees, set at $2,100.00 per plaintiff. Sett. Agr. ¶ 4(e).

If the class member is selected for retention, the class member will be given constructive active duty credit measured from the time of his or her separation from the Air Force to the time that the Secretary of the Air Force approves the result of the last Selection Board. Sett. Agr. ¶ 4(d, i-j). Class members who are selected for retention will receive back-pay and allowances, subject to offsets of earnings from civilian and military employment and any previously provided separation pay. Sett. Agr. ¶ 4(i-j). Those class members who might have been promoted, absent their separation from military service, will be eligible for promotion to the next higher grade. Sett. Agr. ¶ 4(f-h). Any eligible class members who are selected for retention also will be considered for retirement. Sett. Agr. ¶ 4(i). Retirement eligibility will be measured by combining active military service and constructive service. If this combined time is sufficient under 10 U.S.C. § 8911, the class members will be retired. Sett. Agr. ¶ 4(i). Retirement eligibility, however, will not disrupt the status of anyone serving in the Air Force, Air Force Reserves

or the Air National Guard on the settlement approval date.

Under certain enumerated circumstances, qualified individuals may return to active military duty. Sett. Agr. ¶ 4(*o*). Individuals wishing to return to active duty must meet the existing criteria for active military duty eligibility, including citizenship, age requirements, character requirements and physical qualifications. Sett. Agr. ¶ 4(*l*). Notwithstanding these criteria, the Secretary of the Air Force retains full discretion to decline to return an otherwise qualified individual to active duty. Sett. Agr. ¶ 4(n).

Both plaintiffs, through class counsel, and the government have retained the right to return to this court to seek enforcement of the Settlement Agreement if either party alleges that the other has breached the settlement terms. Sett. Agr. ¶ 12. Class members who elect the Selection Board option waive their right to challenge the results or conduct of the Selection Board with regard to them individually, except as an action for breach of the Settlement Agreement in this court, through class counsel. Sett. Agr. ¶ 5. Plaintiffs who opt for the Selection Board also waive their right to challenge the determinations of the Air Force with regard to their eligibility to return to active duty. Sett. Agr. ¶ 5. Finally, all class members waive their right to file any subsequent legal actions or to continue concurrently filed actions against the Air Force related to the actions of the FY 93 RIF Board. Sett. Agr. ¶ 7.

In an order dated January 15, 2003, this court directed class counsel to provide each class member with detailed information regarding the proposed Settlement Agreement. In addition to already having detailed information on the website maintained by plaintiffs' counsel for the class, class counsel mailed each class member information that included: a copy of the proposed Settlement Agreement, a description of the settlement and a class member participation form requesting that each class member select from among three potential choices. The notice

recited that each class member could choose: 1) not to accept the settlement, 2) to select the payment option under the settlement, or 3) to select the Board option under the settlement.

The issue of whether members of an opt-in class could opt out of a settlement agreement negotiated by counsel on behalf of the class as a whole was addressed at a status conference held on May 9, 2003, and in a subsequent order, dated May 14, 2003. The court held that under the Rules of this court, and given the unique nature of litigation against the United States, class members could not choose to opt out of the Settlement Agreement. The court found that RCFC 23, applicable in the United States Court of Federal Claims, does not provide for members of an "opt in" class to opt out of a settlement subsequent to class certification. *See* RCFC 23 and accompanying Rules Committee Note.

Class counsel, therefore, mailed notices to the class members who had indicated that they wished not to accept the settlement. The subsequent notice informed these members that under the settlement they have only two options: the lump sum payment option or the Selection Board option. The notice further informed members that failure to return the form or failure to designate one of the two available options would be deemed an election of the lump sum payment option as indicated in paragraph 4(a) of the Settlement Agreement. Under the settlement, plaintiffs have until thirty days after the approval of the settlement to designate or change their election. If they do not designate within thirty days of the settlement's approval, they will be deemed to have elected the payment option. Sett. Agr. ¶ 4(a).

As of early June, 2003, 556 class members had responded to the notice sent to them by class counsel. This represents just under 90 percent of all class members. Of those who received the election form,[2] 457 selected the payment option, while 99 selected the Board option. Approximately 12 percent of the class, seventy-eight class members, lodged objections to the proposed settlement. Some

---

**2.** Class counsel indicates that some plaintiffs did not receive the forms because they are serving active or reserve military duty. Class counsel is

making ongoing efforts to ensure that these and other plaintiffs are given an opportunity to make an election.

plaintiffs returned multiple writings containing objections and many of the objections are duplicative in substance. The court counted approximately sixty-five separate, substantive objections, although some of the objections merge into each other. Only nineteen, less than one-third, of the sixty-five objections were lodged by three or more class members.

In an order dated June 3, 2003, this court made a preliminary fairness determination, tentatively approving the Settlement Agreement. In that order, the court asked for supplemental information, including information on four aspects of the settlement: 1) the implications of the lump sum payment option by default for class members who were not located by class counsel; 2) the implications of the provision that allows the Air Force not to stay consideration of a class member's records pending a records correction request; 3) the reasonableness of the $2,100.00 in costs, expenses, and attorney fees as it relates to both lump sum payment option recipients and Selection Board participants; and 4) the effect of the waiver provisions on the rights of individual class members. Both parties submitted written materials regarding the areas of concern identified by the court and the objections raised by class members.

The court held a fairness hearing on July 1, 2003. All twenty-one class members who attended the hearing were given an opportunity to voice their opinions before the court. Most in attendance voiced objections to the settlement, although a few voiced their support for the settlement.[3] Some plaintiffs who attended the hearing left before the hearing was completed. Although these individual plaintiffs left before their turn to address the

court, they were provided an opportunity to submit additional written materials.

## DISCUSSION

"[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 317 (3d Cir.1998) (quotations omitted); *see also Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir.) (citing *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir.1982)), *reh'g denied* (2003); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977). "The law favors settlement ... to conserve judicial resources and reduce parties' costs." *Doe v. Delie*, 257 F.3d 309, 322 (3d Cir.2001); *see also In re Painewebber Ltd. Partnerships Litigation*, 147 F.3d 132, 138 (2d Cir.1998); *Leverso v. SouthTrust Bank of Ala. Nat'l Assoc.*, 18 F.3d 1527, 1531 (11th Cir.1994). Particularly in the context of employment discrimination claims, the United States Supreme Court has noted "a strong preference for encouraging voluntary settlement." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (noting also that legislation directed toward vindicating civil rights selects voluntary compliance as the preferred means)).

The United States Supreme Court has stated that in civil rights cases, as in all cases:

Some plaintiffs will receive compensation in settlement where, on trial, they might not have recovered, or would have recovered less than what was offered. And, even for those who would prevail at trial, settlement will provide them with compen-

---

3. Among the plaintiffs who attended the hearing was Wayne P. Philips. Mr. Philips is a licensed attorney. Although the majority of the plaintiffs who attended the hearing conducted themselves with appropriate respect and decorum, Mr. Philips repeatedly rose to disrupt the proceedings while others were addressing the court. He also directed other non-lawyer plaintiffs who were in attendance to similarly rise from their seats to disrupt the proceedings by yelling out the word "objection." His actions eventually necessitated the presence of several court security officers

throughout the duration of the hearing. When asked if he could maintain the proper decorum without the presence of court security officers, Mr. Philips responded that he "can't answer in that fashion." Although not excluded from the courtroom, and subsequently given an opportunity to address the court, Mr. Phillips was moved to a side of the courtroom and seated next to either one or two court security officers for the remainder of the hearing. For a complete recitation of Mr. Philips' behavior, see the recorded transcript of the July 1, 2003 fairness hearing.

sation at an earlier date without the burdens, stress, and time of litigation. In short, settlements rather than litigation will serve the interests of plaintiffs as well as defendants. *Marek v. Chesny,* 473 U.S. 1, 10, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). The Court also noted in *Marek* that settlements serve the interests of the court and the public by "'helping to lessen docket congestion.'" *Id.* (citations omitted).

Class actions, by their complex nature, carry with them a particularly strong public and judicial policy in favor of settlement. *Doe v. Delie,* 257 F.3d at 322; *In re Painewebber Ltd. Partnerships Litigation,* 147 F.3d at 138; *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation,* 55 F.3d 768, 784 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. 297, 312 (N.D.Ga.1993); *see generally,* 4 Newberg, *Class Actions* § 11:41 (4th ed.).

 RCFC 23 governs class actions in this court. It is patterned on Rule 23 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.)(2003) and is similar in both language and effect, although some differences do exist. Both rules provide that "[a] class action shall not be dismissed or compromised without the approval of the court ...." RCFC 23(e); Fed.R.Civ.P. 23(e). The role of the court is to ensure that the proposed settlement is "fair, reasonable and adequate" in order to approve it. *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 316 (quotations omitted). The court has discretion to either accept or reject a proposed settlement. *Id.* at 317 (citations omitted). Accepting or rejecting the proposal are the court's only options, however, as the court cannot alter the terms of a proposed settlement. *Evans v. Jeff D.,* 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (the court cannot adjust attorney fees or lack of attorney fees provided by proposed settlement); *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998) (Without exception, a "settlement must stand or fall in its entirety.")

 Settlement proposals enjoy a presumption of fairness afforded by a court's preliminary fairness determination. *In re Cendant Corp. Litigation,* 264 F.3d 201, 233 n. 18 (3d Cir.2001), *cert. denied,* 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002). Judicial review, however, may overcome that presumption. *See id.* at 232–34. The various United States Courts of Appeals that have reviewed settlement agreements have identified a list of recurrent criteria which provide this court with a framework for analyzing the fairness of a settlement proposal, although the United States Court of Appeals for the Federal Circuit has not adopted a particular set of criteria. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993) (citations omitted). The criteria include the following, some of which are less applicable in this court and in litigation against the United States:

(1) The relative strengths of plaintiffs' case in comparison to the proposed settlement, which necessarily takes into account:

(a) The complexity, expense and likely duration of the litigation; (b) the risks of establishing liability; (c) the risks of establishing damages; (d) the risks of maintaining the class action through trial; (e) the reasonableness of the settlement fund in light of the best possible recovery; (f) the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; (g) the stage of the proceedings and the amount of discovery completed; (h) the risks of maintaining the class action through trial;

(2) Class counsels' recommendation of the proposed settlement, taking into account the adequacy of class counsels' representation of the class;

(3) The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms;

(4) The fairness of the settlement to the entire class;

(5) The fairness of the provision for attorney fees;

(6) The ability of the defendants to withstand a greater judgment, taking into account whether the defendant is a governmental actor or a private entity.

*See, e.g., In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 317, 329; *Staton v. Boeing,* 327 F.3d at 959, 961; *D'Amato v. Deutsche Bank,* 236 F.3d 78, 86 (2d Cir.2001).

The reviewing court, in its discretionary function, applies the appropriate weight to the relevant factors. *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d at 1375–76. Although some federal Courts of Appeals have declined to prioritize these factors, a number of Circuits have stated that the relative strength of plaintiffs' case on the merits balanced against defendant's settlement offer is the most important factor. *See Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1150 (8th Cir.1999); *Isby v. Bayh,* 75 F.3d at 1199; *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1132 n. 44 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).

### *The Relative Strength of Plaintiffs' Case on The Merits Measured Against the Settlement Offer, Accounting for Plaintiff Class Members' Objections*

In order to balance the strength of plaintiffs' case against the settlement offer, the court must first explore how the case would proceed if the case were not settled, including "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. American Brands, Inc.,* 450 U.S. at 88 n. 14, 101 S.Ct. 993. The court should "not decide the merits of the case or resolve unsettled legal questions." *Id.* Rather, the court should gain an understanding of the complexity, expense and likely duration of the litigation, the risks to the plaintiff of establishing liability and damages, and the risks to maintaining the class. In the case currently before the court, if a settlement were not achieved, the next step would be to litigate the constitutionality of the Secretary's Instruction.[4] To understand the complexity and likely duration of a trial on the constitutionality issue, it is necessary to identify the legal standards under which the case would be evaluated if it were to go forward.

According to the Federal Circuit's remand decision, the Secretary's Instruction included references to race and gender, such that the constitutionality of the Instruction must be analyzed under the applicable heightened scrutiny standards. *Berkley v. United States,* 287 F.3d at 1091. The Federal Circuit did not, as some of the class members contend, hold that the Secretary's Instruction was unconstitutional. Nor did it hold that the government acted unconstitutionally in selecting officers for separation pursuant to the Instruction.[5] The Federal Circuit decision simply identified the heightened scrutiny standards as the proper standards by which to analyze the Instruction at the trial level following remand.

Under a heightened scrutiny standard, the burden of proof shifts from the plaintiffs to the government. *See Gratz v. Bollinger,* 539 U.S. 244, 123 S.Ct. 2411, 2427, 156 L.Ed.2d 257 (2003); *United States v. Virginia,* 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). In the case of a racial classification, the government must prove that the challenged action served a compelling governmental interest and that the challenged action was narrowly tailored to further that interest. *Gratz v. Bollinger,* 123 S.Ct. at 2427; *Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 2337, 156 L.Ed.2d 304 (2003); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *see also H.B. Mac Inc. v. United States,* 153 F.3d 1338, 1345 n. 7 (Fed.Cir. 1998) (noting that "all race-based preferences

---

4. Some class members contend that the government would not attempt to meet the heightened scrutiny standards if the case were litigated. At the fairness hearing, however, the government stated that it had not decided whether to defend the constitutionality of the Secretary's Instruction if the case were not settled.

5. The remand decision also states: "[W]e do not reach the question of what effect, if any, deference to the military would have on the judicial application of strict scrutiny." *Berkley v. United States,* 287 F.3d at 1091.

must be reviewed under strict scrutiny."). The United States Supreme Court has noted that remedying a substantiated showing of past racial discrimination serves a compelling government interest, *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 497–511, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), but that other compelling governmental interests also may survive strict scrutiny. *Grutter v. Bollinger,* 123 S.Ct. at 2339. In the case of a gender classification, under an intermediate standard of scrutiny, the government must prove that the challenged action served an important governmental objective and that the challenged action was substantially related to achieving that objective. *United States v. Virginia,* 518 U.S. at 516, 116 S.Ct. 2264; *Mississippi Univ. For Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

Theoretically, heightened scrutiny standards are more favorable to the plaintiffs than the rational basis standard previously employed by this trial court to review the Instruction in its earlier decision, *Berkley v. United States,* 48 Fed.Cl. at 379. *See also Berkley v. United States,* 287 F.3d at 1091–96 (Dyk, J., dissenting); *Saunders v. White,* 191 F.Supp.2d 95, 126–27 (D.D.C.2002). Recent case law reinforces the notion, however, that the government's burden under strict scrutiny is not insurmountable. The Supreme Court recently upheld a state university's admissions practice that included a racial classification. *See Grutter v. Bollinger,* 123 S.Ct. at 2347. The Supreme Court in *Grutter* specifically restated a frequently used quotation that "[s]trict scrutiny is not 'strict in theory, but fatal in fact.'" *Grutter v. Bollinger,* 123 S.Ct. at 2338; *Adarand Constructors, Inc. v. Pena,* 515 U.S. at 237, 115 S.Ct. 2097 (citing *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Powell, J., concurring)). Although the education admissions process was the factual predicate in *Grutter,* strict scrutiny cases decided in the context of education have historically been analogized to other governmental actions. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. at 200, 115 S.Ct. 2097. Moreover the Supreme Court in *Grutter* specifically noted that high-ranking retired officers and civilian leaders

in the military had asserted in an amicus brief that: "a 'highly qualified, racially diverse officer corps ... is essential to the military's ability to fulfill its principle [sic] mission to provide national security.'" *Grutter v. Bollinger,* 123 S.Ct. at 2340 (citing Brief for Julius W. Becton, Jr. *et al.* as *Amici Curiae* 27).

In the case before the court, to meet its burden regarding the reference to racial minorities in the Secretary's Instruction, the government first would have to establish a compelling governmental interest. *Adarand Constructors, Inc. v. Pena,* 515 U.S. at 227, 115 S.Ct. 2097; *City of Richmond v. J.A. Croson Co.,* 488 U.S. at 497–99, 109 S.Ct. 706. To meet its burden regarding the reference to women in the Instruction, the government first would have to establish an important governmental interest. *United States v. Virginia,* 518 U.S. at 532–33, 116 S.Ct. 2264; *Mississippi Univ. For Women v. Hogan,* 458 U.S. at 724, 102 S.Ct. 3331. Second, the government would have to prove that the Secretary's Instruction was narrowly tailored to remedying the compelling governmental interest, and substantially related to remedying the important governmental interest. *See United States v. Virginia,* 518 U.S. at 532–33, 116 S.Ct. 2264; *Adarand Constructors, Inc. v. Pena,* 515 U.S. at 227–28, 115 S.Ct. 2097; *Mississippi Univ. for Women v. Hogan,* 458 U.S. at 724, 102 S.Ct. 3331. Merely calling the Instruction "remedial" is not sufficient to prove that it was narrowly tailored. *City of Richmond v. J.A. Croson Co.,* 488 U.S. at 500, 109 S.Ct. 706 ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice."). If the government failed to prove either of these two elements regarding the racial or the gender classification, the Instruction would be deemed unconstitutional. The recent decisions by the United States Supreme Court in *Gratz v. Bollinger,* 123 S.Ct. at 2411, and *Grutter v. Bollinger,* 123 S.Ct. at 2325, were decided following the remand decision in this case by the United States Court of Appeals for the Federal Circuit. Those two Supreme Court cases have added further guidance in cases involving racial references and further

uncertainty to plaintiffs' case regarding the tests to be applied to the racial and gender directives in the Secretary's Instruction.

Leading up to this court's previous disposition of the constitutionality issue, the parties had cross-moved for judgment on the administrative record. *Berkley v. United States,* 48 Fed.Cl. at 365–66. Following the remand, it is unclear if a similar motion practice disposition of the constitutionality issue would be appropriate, or if a trial or hearing would be required. All approaches would consume significant, additional time and effort from both parties. In the case of motion practice, a joint record would require careful and time consuming preparation because the record used by the trial court during past proceedings would have to be enhanced substantially for review under strict or intermediate scrutiny. Similarly, trial or hearing preparation, including witness preparation, would engage both parties and require considerable effort. Moreover, although the underlying facts of the case are well understood, either resolution may require additional discovery to develop a useful record and/or appropriate exhibits.

Finally, pursuant to the Federal Circuit's decision in *Christian v. United States,* resolution of the constitutionality issue is only the first step in resolving this case if plaintiffs are to succeed. *See Christian v. United States,* 337 F.3d 1338, 1347–49 (Fed.Cir.), *reh'g denied* (2003). The plaintiff class members do not automatically prevail even if this court were to determine that the Instruction fails either heightened scrutiny standard regarding race or gender. The court then would have to remand the case to the Air Force for the Secretary to determine whether the prohibited Instruction affected each individual plaintiff's proceedings before the FY 93 RIF Board, or, stated otherwise, whether each class member would have been selected for separation regardless of the impermissible instruction. *See id.* In *Christian,* the Federal Circuit held that if the military removes a group of officers from active service, and if the Secretary's Instruction that motivated the separation of those officers from service is deemed unconstitutional, the military does not have blanket liability to a certified class of those officers. *See id.* at 1347.

If the Secretary finds that an officer would have been selected for separation notwithstanding the improper Instruction, the Instruction is considered "harmless error" in the procedure used to separate that officer from active service. *Id.* at 1345–46. In such a case, that individual officer is not entitled to relief, because there is no " 'nexus between the error or injustice and the adverse action.' " *Id.* at 1343 (citations omitted); *see also id.* at 1344–47. Although the Federal Circuit couched its holding in *Christian* as applying to damages rather than liability, *id.* at 1345, the result is the same: only class member plaintiffs whose separation from active service was caused by an impermissible Instruction can receive relief. *Id.* at 1347.

Applying the *Christian* standard to this case, even if this court were to determine that the Instruction used by the FY 93 RIF Board fails either heightened scrutiny standard, the court's decision would not entitle any class member to automatic recovery. *Id.* at 1347–48. Rather, the individual cases would have to be remanded to the Secretary of the Air Force. *Id.* at 1349. The Secretary would have two choices. The Secretary could appoint a new Selection Board to reevaluate each officer individually, without using the impermissible Instruction. *Id.* The Board would recommend to the Secretary which officers should be selected for retention and which ones should be selected for release. *Id.* The Secretary would then make the final determination regarding which class members the Air Force should retain. *Id.* Alternately, the Federal Circuit suggested that the Secretary could make the retention determination without employing a Selection Board. *Id.* In either case, the Secretary's "informed discretion" would drive the determination regarding which officers should be retained. *Id.* After the Secretary's harmless error determination, the case would return to this court for challenges to the Secretary's decision and, in appropriate cases, to formulate damages. *Id.* The class composition would be fundamentally altered, however, because the Secretary's reevaluation process would have bifurcated the class into those

plaintiffs not selected for retention and those plaintiffs selected for retention.

The first group, those individual plaintiffs not selected for retention under a corrected Instruction, could challenge the Secretary's decision. *Id.* The government would bear the burden of proving harmless error, "that, despite the plaintiff's prima facie case, there was no substantial nexus or connection" between the impermissible Instruction and the non-selection of each plaintiff upon reevaluation. *Id.* at 1343. The Federal Circuit did not clarify how this court should reconcile the deference it owes to the "informed discretion" of the Secretary while determining whether the Secretary has met his or her burden of persuasion in proving harmless error, *Christian v. United States,* 337 F.3d at 1349, two standards that may be inconsistent. It is not, however, necessary to resolve this issue now. *Carson v. American Brands, Inc.,* 450 U.S. at 88 n. 14, 101 S.Ct. 993. The court notes that the conflicting standards would add an additional element of uncertainty to the progress and outcome for the plaintiffs in this case if litigation were to continue.

The second group, those plaintiffs for whom the impermissible Instruction caused material error, would return to this court for a different purpose. The Secretary would have already determined that, but for the prohibited Instruction, these plaintiffs would have been retained by the 93 RIF Board. These plaintiffs would be viewed as never having been legally separated from active Air Force service. Therefore, the court's role would be to formulate a remedy for the time that they were illegally separated from service. These plaintiffs likely would be entitled to back-pay for constructive service credit under 37 U.S.C. § 204 (2000) because "an officer is entitled to the pay of the position to which he [or she] was legally appointed. It must follow that he [or she] is still entitled to it if illegally separated, for such discharge is not legally recognizable." *Skinner v. United States,* 219 Ct.Cl. 322, 333, 594 F.2d 824, 831 (1979) (citing 37 U.S.C. § 204).

This court also might be able to formulate appropriate declaratory and injunctive remedies collateral to money damages. *See, e.g.,*

*Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir.1999) (correction of records is a permissible collateral remedy); *Craft v. United States,* 218 Ct.Cl. 579, 584–85, 589 F.2d 1057, 1059 (1978). But because courts are ill-equipped to make military personnel decisions, *Gilligan v. Morgan,* 413 U.S. at 10, 93 S.Ct. 2440, there are limitations on this court's ability to grant requests for declaratory and injunctive relief, *see generally Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842, *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953). As the Supreme Court has stated:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

*Gilligan v. Morgan,* 413 U.S. at 10, 93 S.Ct. 2440.

This court should not, and could not, reinstate any plaintiff to active duty, as many class-members request. *See Knutson v. Wisconsin Air Nat'l Guard,* 995 F.2d 765, 771 (7th Cir.) (Request for reinstatement is nonjusticiable because it would require the court "to intrude on a province committed to the military's discretion, which [the court] decline[d] to do."), *cert. denied,* 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993); *Crawford v. Cushman,* 531 F.2d 1114, 1126 (2d Cir.1976) (when plaintiff was illegally discharged from active military service, "reinstatement" only for purposes of attaining the financial equivalent of reinstatement was a sufficient remedy). Moreover, if the Secretary reinstates a plaintiff to active duty, this court cannot order the Secretary to promote him, *Skinner v. United States,* 219 Ct.Cl. at 332–33, 594 F.2d at 830, or order the Secretary to assign that officer to his or her desired duty, *Orloff v. Willoughby,* 345 U.S. at 94, 73 S.Ct. 534.

In summary, if the instant case were to proceed through litigation, both parties, including each individual plaintiff, bear a risk at each stage, first, with regard to this

court's determination of the constitutionality of the Secretary's Instruction, next, with regard to the Secretary's "harmless error" determinations and then when this court reviews the Secretary's "harmless error" determinations. The cases could then be appealed and the parties could bear these risks anew. Finally, there is a risk that even if individual plaintiffs succeed at all of these procedural steps, this court could lack the power to grant the specific relief, such as reinstatement or specific assignments, sought by those plaintiffs. In short, the outcome of this litigation is far from clear. What is clear is that the remaining issues to be resolved, if the litigation proceeds absent a settlement, will consume considerable time, effort and costs for both parties. Having explored the risks of litigation, the court turns to balancing these risks against the settlement offer.

### The Lump Sum Payment Option

First, balancing the payment option against possible litigation out comes, the court finds that the $30,000.00 lump sum payment option is fair and weighs in favor of approving the settlement. A just settlement amount "is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982); *see also In re NASDAQ Market–Makers Antitrust Litigation,* 187 F.R.D. 465, 478 (S.D.N.Y.1998). Moreover, the approving court need not make a fairness determination with mathematical precision, because " '[t]he weighing of a claim against compensation cannot be ... exact. Nor should it be, since an exact judicial determination of the values at issue would defeat the purpose of compromising the claim ....' " *In re NASDAQ,* 187 F.R.D. at 478 (quoting *Air Line Pilots Assoc.*

*v. American Nat'l Bank and Trust Co. of Chicago,* 156 B.R. 414, 431 (S.D.N.Y.1993)).

In this case, the $30,000.00 lump sum payment amount falls between the plaintiffs' and defendant's "competing notions of reasonableness." *In re Corrugated Container Antitrust Litigation,* 659 F.2d at 1325. A reasonable agreement most favorable to the government would dictate that no lump-sum alternative should be available; rather, that each plaintiff would have to undergo a harmless error analysis in order to recover, as dictated by the recent decision of the United Stated Court of Appeals for the Federal Circuit in *Christian v. United States,* 337 F.3d at 1349. Under that scenario, only plaintiffs whose military service records indicate that they should have been retained would garner the benefits of retention at the taxpayers' expense. At the other end of the spectrum, a reasonable agreement most favorable to the plaintiff class might dictate that all plaintiffs could elect to receive a lump sum payment equal to at least the average back pay calculation, after offsets. In theory, this is the dollar amount that would make the "average" plaintiff whole. Plaintiffs' counsel calculated this figure to be a maximum of $85,000 per class member for the period of January 1, 1993 to December 31, 2002, although in one of the briefs submitted to the court, plaintiffs' counsel admitted that this figure may be inflated.[6] Given the speculative nature of the calculation, and noting that this is a negotiated amount, the court finds that a guaranteed lump sum of $30,000.00 is not unreasonable, as is more fully discussed below.

One of the court's primary concerns regarding the lump sum figure was its use as the default provision. *See* Sett. Agr. ¶ 4(a). Both the court and the parties recognized that because the settlement does not contain an opt-out provision, there needs to exist a default provision for those plaintiffs who do

---

6. Plaintiffs' counsel calculated the amount necessary to make the "average" class-member plaintiff whole. To accomplish this, plaintiffs' counsel gathered income and service data from the class members for the years following the RIF. Based only on the information that was returned to counsel by class members, counsel calculated the average year group to be 1986. Based on the average year group, counsel calculated back pay and allowances as if each plaintiff had served over six years for pay purposes as of January 1, 1993. Counsel then calculated the back pay and allowances for each year through 2002, adding the applicable increases in pay for each two-year interval.

not make a designation. After some plaintiffs failed to respond to the notice sent by class counsel, it became apparent that some of those plaintiffs may not have responded by choice, some may not have received the notices sent by class counsel and, in some cases, plaintiffs did not respond because they were deployed on active military duty. Bearing these plaintiffs in mind, the court requested the parties to address the fairness to plaintiffs whom class counsel could not locate of receiving the payment option by default. In response, class counsel stated:

> Based upon extensive communications with class members it readily became apparent that if the agreement which had been outlined to class members was approved, the great majority of the class members would choose the payment option. In light of this fact and the need for a default provision, class counsel favored the Payment Option as the default choice. The Government favored the Payment Option for other reasons including the desire to preclude a class member from theoretically indefinitely extending the potential period of constructive service by delay in selecting an option. The parties agree, however, the period of time for a class member to elect an option under the settlement will be extended for any class member whose ability to respond has been materially affected by the exigencies of military service.

Defendant echoed this position, stating first that an overwhelming majority of plaintiffs responded by choosing the payment option, rendering it the logical default provision. Second, the government found it unacceptable to stay the Selection Board process for plaintiffs who could not be located because delaying the Selection Board process could inequitably benefit plaintiffs by creating a potentially longer constructive service period. The defendant also indicated that "inasmuch as this is an opt-in class, it is reasonable to expect class members to keep their counsel informed of their whereabouts, thus, any prejudice to individuals who may not be located, despite the best efforts of class counsel, is, to some degree, their own responsibility."

After reviewing the briefs and counsels' oral statements, the court believes that any concerns regarding whether plaintiffs whose active military service has hindered their ability to respond can be accommodated. After consideration, the court also believes that the use of the lump sum payment as a default provision is a reasonable approach, despite the objections raised by a relative minority of the plaintiffs, as discussed below.

■■■ The court must consider class members' objections to the proposed settlement as one factor in its fairness analysis. *See In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. at 326. " 'A settlement can be fair notwithstanding a large number of class members who oppose [it].' " *Id.* at 326 (quoting *Cotton v. Hinton,* 559 F.2d at 1331); *see also Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir.) (affirming a settlement approval in which 20 percent of the class objected, and in which 82 of 452 class members appealed approval), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Lazy Oil Co. v. Wotco Corp.,* 95 F.Supp.2d 290, 333 (W.D.Pa.1997) (also noting that "silence constitutes tacit consent.") (quoting *Hammon v. Barry,* 752 F.Supp. 1087, 1092–93 (D.D.C.1990)), *aff'd,* 166 F.3d 581 (3d Cir.1999), *cert. denied,* 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999). Moreover, class action settlements may be approved in spite of objections from named class representatives. It has been recognized "that the duty owed by Class Counsel is to the entire class and is not dependent on the special desires of the named plaintiffs. It also has been held that agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable." *Parker v. Anderson,* 667 F.2d 1204, 1211 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *see also Kincade v. General Tire and Rubber Co.,* 635 F.2d 501, 507 (5th Cir.1981) ("Because of the unique nature of the attorney-client relationship in a class action, the cases cited by appellants holding that an attorney cannot settle his individual client's case without the authorization of the client are simply inapplicable."); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1174 (4th

Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

The objection raised by the largest number of plaintiffs to the proposed settlement addresses the adequacy of the lump-sum payment. Most of these objectors indicated that $30,000.00 is, in their opinion, too small to make them whole. But "'the essence of a settlement is compromise.'" *Staton v. Boeing Co.,* 327 F.3d at 959 (quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d at 624); *In re Corrugated Container Antitrust Litigation,* 659 F.2d at 1325. Settlements often provide incentives to plaintiffs to accept less compensation than the amount that purportedly would make them whole. *See Franklin v. Kaypro Corp.,* 884 F.2d at 1231 n. 18. Even if this court viewed the lump-sum payment as inadequate, federal courts of appeal have counseled against the court imposing its own view of the appropriate settlement amount. "In deciding the fairness of a proposed settlement, we have said that '[t]he evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.'" *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 316–17 (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation.,* 55 F.3d at 784).

In this case, the plaintiffs could have anticipated the possibility of a settlement resolution rather than individually-tailored judgments when they joined a plaintiff class. By joining a class action, plaintiffs chose not to hire and pay for attorneys to represent their individual interests. They should have understood that the interests of all plaintiffs would come into play in devising litigation strategies or beneficial settlement options. Additionally, under the settlement proposal, plaintiffs do not lose the ability to further pursue their cases if they choose the Board option.

The lump sum payment option contains incentives to forgo the monetary amount that might be attained if further litigation or agency action is pursued. Under the lump sum option, there is no offset for earned income, plaintiffs receive quicker payment and plaintiffs do not have to enter into further evaluative review of their individual records. For those plaintiffs who choose the payment option, these factors can balance against the payment option's fixed amount. Those plaintiffs who believe that they are owed more than $30,000.00 have an option that could allow them to receive a judgment in excess of $30,000.00, they can select the Board option. In this regard, some plaintiffs contend that the Settlement Agreement favors those selecting the payment option. The payment option is less complicated and is guaranteed. For these reasons, some plaintiffs have indicated that even if they feel they deserve more than $30,000.00, the time and expense that they save by avoiding a continued evaluative process with multiple procedural stages is worth accepting the potentially lesser payment under the lump sum payment option.[7]

The lump-sum payment guarantees to plaintiffs, even those plaintiffs who could not recover with further litigation, some recovery. Guarantees serve as powerful incentives to settle voluntarily, thereby avoiding the "risks" and "uncertainties of litigation." *See Carson v. American Brands, Inc.,* 450 U.S. at 87, 101 S.Ct. 993. "Settlements offer other benefits that might induce plaintiffs to accept smaller amounts." *Franklin v. Kaypro Corp.,* 884 F.2d at 1230 n. 16. Weighing the benefits of these guarantees "allow[s] parties to 'manage their own disputes' and avoid the uncertainties and limitations of the winner-take-all, imposed decisions that courts make in fully litigated cases." *Id.* (citation omitted).

Plaintiffs who choose the payment option are guaranteed a lump sum payment of $30,000.00. *See* Sett. Agr. ¶ 4(b). Even plaintiffs who chose the Board option and, after proceedings, are not selected for reten-

---

7. Based on the limited evidence in the record to date, the court wonders whether some of the plaintiffs who object most vocally to the size of the lump-sum payment include those whose service records may render the Board option an unrealistic option for them personally.

tion, are guaranteed a $5,000.00 payment. *See* Sett. Agr. ¶ 4(e). To the contrary, if plaintiffs were to pursue further litigation in this court, no plaintiff would be guaranteed any recovery at any stage of the proceedings. Moreover, those plaintiffs, if any, who win on the merits after all stages of further proceedings in the court and at the Air Force still could recover less than is guaranteed by the settlement, and might even recover nothing. In some instances, for example, plaintiffs could not obtain back pay due to offsets from income earned following their separation from active military service. The settlement guarantees to that same group of plaintiffs a payment of $30,000.00 if they select the lump sum payment option.

Some plaintiffs object to the dollar amount of the lump sum payment because it compares unfavorably with what they consider to be analogous payments by the military, namely, the separation pay offered to plaintiffs had they voluntarily separated from active duty in the Air Force prior to the FY 93 RIF Board and current payments by the military to retain officers. Regarding the separation payment offered to plaintiffs in 1993, they voluntarily chose not to accept such separation pay. Regarding current payments by the military to retain officers, there is no real comparison to be made. Rather, the $30,000.00 lump sum payment represents to the plaintiffs who accept it, the value of an immediate, guaranteed payment unencumbered by future litigation. Finally, counsel for both sides have indicated that after extensive negotiation, the government would not agree to a settlement that contained a lump sum option higher than $30,000.00. Thus, to the extent that some plaintiffs desire a guaranteed payment option, they appear to have attained the most lucrative one available under the circumstances.

**The Selection Board Option**

As with the payment option, it is necessary to explore how the case would proceed through litigation in order to balance the benefits and risks of litigation against those of the proposed settlement. As previously discussed, if the case were litigated, all plaintiffs would have to undergo a selection procedure anew pursuant to *Christian v. United States,* 337 F.3d at 1347–49, and would have to prevail in a Selection Board in order to seek a damages remedy at this court.

*The Mechanics of the Board Option*

The United States Court of Appeals for the Federal Circuit recently described and approved a procedure generally to be used by the Air Force when conducting Special Selection Boards (SSBs) convened as a result of litigation, pursuant to Air Force Instruction (AFI) 36–2501, Chapters 2 and 6. *See Haselrig v. United States,* 333 F.3d 1354, 1356 (Fed.Cir.), *reh'g denied* (2003). In *Haselrig,* the Federal Circuit examined promotion boards convened pursuant to AFI 36–2501, Chapter 2. That same Air Force Instruction dictates in Chapter 6 that SSBs should be conducted, as much as possible, according to the procedure outlined in Chapter 2. The Federal Circuit described the procedure.[8]

> In carrying out the mandate of 10 U.S.C. § 628(b)(2), the Air Force requires that an SSB "[c]onsider the records of officers as they would have appeared to the original Board had the officers been properly considered" and that it "[c]ompare the officers' records with benchmark records from the original Boards," using the same scoring methodology prescribed for the original Boards. Air Force Instruction (AFI) 36–2501 ¶¶ 6.5.2, 6.5.3. This is accomplished by taking the five highest scoring non-selected records, the five lowest scoring selected records, and the record being

8. There is some conflict in the nomenclature between the Federal Circuit's *Haselrig* decision and the Settlement Agreement regarding use of the terms "select benchmark files" and "non-select benchmark files." The court in *Haselrig* refers to the five highest scoring benchmark records as the non-selected records, meaning that those five individuals were not selected for separation, and, thus, were retained by the Air Force.

*See Haselrig v. United States,* 333 F.3d at 1356. The Settlement Agreement refers to the five highest scoring benchmark records as the selected records because those five individuals were selected for retention, and the individuals to whom those records pertain as "selectees." Sett. Agr. (4)(c)(ii)(D). This court uses the terms consistently with the Settlement Agreement throughout the opinion.

reconsidered and re-scoring all eleven records by a single SSB. AFI 36–2501 ¶ 3.3. The record being reconsidered is recommended for retroactive promotion if it scores above all five of the previously non-selected records and at least ties the lowest previously selected record. AFI 36–2501 ¶ 6.5.4.

*Id.* at 1356. In addition to using the same scoring methodology, the SSB should use the same instructions as employed by the original selection board, minus any portion that was deemed impermissible by the court. *Christian v. United States,* 337 F.3d at 1348–49; *see also Haselrig v. United States,* 333 F.3d at 1356.

If this case were to be litigated further, rather than settled, a Selection Board would employ the same Instruction as employed by the FY 93 RIF Board, minus the references to gender and race contained in paragraph 7 of the Instruction. *See Christian v. United States,* 337 F.3d at 1348–49. The mandatory separation quotas, or statement of the number of officers who needed to be selected for separation per year group, however, would remain part of the Instruction. If the case were litigated, rather than settled, and individual plaintiffs proceeded to a Selection Board, the presence of the target numbers would necessitate that plaintiffs compete with each other, and with those who were retained, for the limited number of retention slots that were identified as available, regardless of whether the racial and gender references were considered by the FY 93 RIF Board. Also limiting the retention rate, if the case were litigated, the offending references could have harmed no more plaintiffs than the total number of racial minorities and females selected for retention by the FY 93 RIF Board. As the Federal Circuit observed in *Christian v. United States:*

> The constitutional claim is that the white officers who were [separated] as a result of the Retirement Board proceedings were denied equal protection because of the Instructions to the Board to give minority and female officers preferential treatment. The total number of minority and female officers retained was 341. Even if one were to assume that every one of those

officers was retained solely because of an impermissible preference accorded minorities and females-a most unlikely assumption-at most that would mean that 341 white officers who were [separated] should have been retained.

*Id.* at 1344. Therefore, even if the case were litigated, not all plaintiffs could be selected for retention because of the year group quotas for retention and the improbability that the references to race and gender materially harmed all plaintiffs. Finally, if the case were litigated, the Secretary would retain ultimate discretion to decline to select any individual plaintiff for retention. *Id.* at 1349.

Under the Board option in the proposed settlement, a Selection Board will be convened, and will evaluate the records of those plaintiffs who choose the Board option. The Selection Board convened pursuant to the Settlement Agreement will review plaintiffs' military service records, as well as benchmark records of officers who were originally retained by the FY 93 RIF Board. The Selection Board will then evaluate the records with the original FY 93 Instruction, excluding the paragraph containing the racial and gender references and, of equal importance, excluding the year group quotas. Sett. Agr. ¶ 4(c)(2)(C). If a plaintiff's file attains a score above any single benchmark file retained by the FY 93 RIF Board, he or she will be selected for retention. Sett. Agr. ¶ 4(c)(2)(D). Under the Board option, plaintiffs records will not be compared to any benchmark file of an officer selected for separation by the original FY 93 RIF Board.

Under the proposed settlement Board option, the Secretary of the Air Force has a more limited role in reviewing the Selection Board results. Under the proposed settlement Board option, the Secretary's role is to determine whether the Selection Board was properly constituted and conducted in accordance with applicable law, directives, the Secretary's Instruction to the Selection Board and this Settlement Agreement. Sett. Agr. ¶ 4(d). The Secretary can "return a report to the Board for further consideration, with appropriate instructions" upon a finding that one of the criteria has not been followed. Sett. Agr. ¶ 4(d). The Secretary, however,

does not have discretion to de-select any individual plaintiff retained by the Board under the Settlement Agreement. Sett. Agr. ¶ 4(d).

Balancing the Board option under the Settlement Agreement against the regular Board procedures that would ensue following litigation, the court finds that the procedures are comparable, but that any differences in the two procedures benefit plaintiffs selecting the Settlement Agreement Board option. There are no mandatory separation quotas under the settlement Board option procedure, so that, theoretically, every plaintiff who chooses the Board option could be selected for retention. Under a regular Selection Board convened following litigation, plaintiffs would have to compete for the limited number of positions that would have been available to that year group in the absence of the offending Instruction. Some class members mistakenly believe that intra-class competition exists under the settlement Board option. Excluding the mandatory separation quotas from the Instruction in the proposed settlement Board option eliminates that competition and should alleviate this particular concern among plaintiffs.

Also to plaintiffs' benefit, the standard for comparing the plaintiffs' records against the benchmark records is significantly relaxed under the settlement Board option compared to the normal AFI 36–2501, Chapter 2 procedure for Special Selection Boards. Normal AFI procedure dictates that plaintiffs' files be compared to benchmark files of both officers retained by the original RIF Board and officers selected for separation by the original RIF Board. The plaintiffs would have to attain a score higher than all five of the benchmark files selected for separation, and would have to at least tie one of the files selected for retention. The relaxed Board standard under the settlement Board option provides that plaintiffs need only outscore one of the benchmark files retained by the FY 93 RIF Board. Under the settlement Board option, the Air Force will not compare plaintiffs' files to benchmark files selected for separation, so plaintiffs will not have to outscore any, let alone five, of those benchmark files. This relaxed standard relieves plaintiffs of a significant burden toward being selected for retention.

Additionally, under the settlement, the Secretary of the Air Force has a very limited role in the selection process that does not involve exercising discretion with regard to any individual plaintiff. As a comparison, if the case were litigated and proceeded to a Selection Board convened pursuant to AFI 36–2501, Chapter 6, the Secretary, in his or her discretionary role, would decide whether the original Instruction was material to the separation of each plaintiff from service by the FY 93 RIF Board, or was harmless error. Under the settlement, the Selection Board decides whether to retain each plaintiff and the Secretary does not have discretion to de-select any plaintiff. Considering that many of the plaintiffs who objected to the Board option expressed distrust of the Secretary's use of his or her discretion, the Secretary's reduced role in retaining plaintiffs under the settlement might be considered a benefit by the plaintiffs.

Further weighing in favor of approving the settlement agreement is that the Selection Board option under the settlement proposal is one of two alternative options available to each plaintiff. Unlike if the case were litigated, no plaintiff is compelled to participate in a Board selection process in order to recover. If a plaintiff feels that his or her records could not withstand the selection process, or if a plaintiff considers finality and certainty to be more valuable than potential constructive service credit recovery, any plaintiff can opt for the lump-sum payment instead of the Selection Board option under the Settlement Agreement.

The objections raised by plaintiffs regarding the Board option fall into roughly six subcategories: objections that neither the lump sum nor Board option makes them whole, objections that no settlement option should involve an evaluative process such as is included in the Board option, objections to the Air Force's ability to fairly carry out a Board procedure, objections to certain mechanics of the proposed Board, objections to various aspects of trying to reconstruct service records for Board review and objections to the remedies provided by the Board option.

One group of similar objections addresses the large size of the FY 93 RIF and the general manner in which it was conducted. Essentially, plaintiffs make sweeping objections that because the FY 93 RIF was so large, it separated from service many dedicated and capable officers who had planned on military careers. As one plaintiff states:

I know many officers who were also separated by the FY 93 Reduction in Force Board, and we shared one similar experience. We were all advised by our superiors that our chances of being selected for involuntarily [sic] separation were virtually one-hundred percent. Yet, we refused to accept a voluntary exit bonus which had a much larger cash payment than the involuntary separation pay we would eventually receive. We chose our path not because of a belief that somehow we would not be selected, but a belief in our *service* and a belief in *ourselves*.

(emphasis in original). Another plaintiff similarly objects that the Air Force failed its own "core values." A further group of plaintiffs objects that the FY 93 RIF was couched as a "quality" cut. These plaintiffs argue they had successful military careers, and that having been selected for separation based on "performance" distorted their records of success in both the Air Force and in their post-military careers. An additional group of plaintiffs objects that their separation from the Air Force was a result of unfair "personnel policies and poor leadership on the part of the [A]ir [F]orce."

This court has no doubt that some very capable and dedicated officers were selected for separation by the FY 93 RIF Board. As class counsel observed in reviewing the plaintiffs records:

[In t]he case of [a particular plaintiff], however, I don't know why he was RIFed. He has got a sterling record as do a large number of the people that are sitting here in your courtroom today. There are not clear discriminators that jump off the page that say ... I know why he was RIFed. Quite frankly, it was a forced choice situation with quotas by year group, and the board did what it had to do, but how they drew their lines of who stayed and who

went appears to me to be totally illogical from the records I am seeing.

It is clear that many officers who were selected for separation by the FY 93 RIF Board were capable of future success in the military as well as in civilian life. The aptitude of these plaintiffs is evidenced by many of them attaining success and recognition in the Air Force Reserves, in the Air National Guard, in some cases, during further active military duty, and in post-military careers. There is no remedy at law, however, for an otherwise qualified officer being selected for separation when congressional action calls for an unusually large Reduction in Force. *See Gilligan v. Morgan*, 413 U.S. at 10, 93 S.Ct. 2440 (stating that the military is subject to the civilian control of the legislative and executive branches, notably excluding the judiciary). This court should not dabble in issues affecting force strength in this or any other litigation. Therefore, in this case, which challenges the constitutionality of the Secretary's Instruction, this court also should not reject the proposed settlement because it fails to address issues regarding personnel numbers and the general manner in which the RIF was conducted. The court only should evaluate whether the Board option fairly redresses any material error brought about by the reference to race and gender in the Secretary's Instruction.

Some plaintiffs object because they do not trust the Air Force to act in good faith in reevaluating the plaintiffs. As stated by one plaintiff, the Air Force is "attempting to recreate a fair board ten year[s] later[,] conducted by officers who were our peers a decade ago. If they could not conduct a fair board ten years ago, how can they conduct a fair board now ...?" These plaintiffs cite a multitude of factors in the FY 93 RIF process that instilled in them an ongoing suspicion about the Air Force's ability to follow a fair procedure. For example, plaintiffs cite "grievous issues that played a part in the RIF process;" recite a long list of contentions with alleged illegalities of previous Boards; state that "[w]e were unconstitutionally separated due to miscommunications, mistaken paperwork, lies, vindictive commanders and illegal instructions to the RIF Board;" and in

the case of one plaintiff, contend that although her assignment was considered prestigious, the remoteness of her assignment and lack of face to face contact with her commanding officer, who was from a different branch of the military altogether, caused her commanding officer to give her an unfairly weak recommendation.

Although the court recognizes that this group of objectors feels aggrieved by the FY 93 RIF process, in evaluating the fairness of the settlement, this court must recognize the strong presumption of regularity accompanying government proceedings, including that the military carries out its responsibilities properly, lawfully and in good faith. *See Richey v. United States,* 322 F.3d 1317, 1326 (Fed.Cir.2003); *Porter v. United States,* 163 F.3d 1304, 1316 (Fed.Cir.1998), *reh'g denied, en banc suggestion declined, cert. denied,* 528 U.S. 809, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999). This presumption stands unless plaintiffs present to the court record evidence of actual, not potential, irregularity. *Richey v. United States,* 322 F.3d at 1327. Plaintiffs have voiced their self-admitted cynicism and allegations of past events as evidence that the Board procedure under the settlement will be unfair. If evidence of Board irregularity in future proceedings comes to light, in the first instance, the Air Force Secretary should identify such irregularity upon review of the completed Board proceedings. If that fails, the Settlement Agreement provides that plaintiffs, through class counsel, can return to this court for enforcement of the settlement's terms. Paragraph 12 of the proposed Settlement Agreement confirms the court's authority to ensure that the Air Force complies with the terms of the Agreement. In addition to the presumption of regularity, the court also must take into account the proposed settlement's additional procedural safeguards. For example, under the settlement, the Secretary lacks his or her usual discretion in deciding which individual plaintiffs the Air Force should select for retention. Under the settlement Board option, the Secretary cannot, as some class members fear, strike the names of individual plaintiffs selected for retention by the Selection Board, in contrast to a litigated outcome in which the Secretary would have such discretion.

Some plaintiffs object because the court does not have broad authority to oversee the Board's selection decisions. As one plaintiff stated: "I would like to see somebody standing behind [the Board] with a pencil[,] paper and a tape recorder while they have the board." But this court should not be in the business of second guessing the military's selection and personnel decisions. *See Gilligan v. Morgan,* 413 U.S. at 10, 93 S.Ct. 2440. The court is ill-equipped to make such determinations. *See id.* If the litigation were to continue, however, the court would possess its usual powers to ensure that the Air Force acts in accordance with the law in its selection process and that the Secretary does not abuse his or her discretion. With regard to the Settlement Agreement, the court has the same type of power, except that it has the added power of ensuring that the Air Force also acts in accordance with the terms of the Settlement Agreement. Because judicial oversight under the Agreement is comparable to judicial oversight available over a Board convened pursuant to AFI 36–2501, Chapters 2 and 6, these objections fail to raise valid concerns about the sufficiency of such judicial oversight.

There are plaintiffs who contend that the general unfairness of the original FY 93 RIF process has irreparably compromised any reevaluative process conducted for this group of plaintiffs. According to these plaintiffs, the lingering impact of the references to race and gender included in the original Instruction can never truly be eliminated from an evaluative process. From this, some plaintiffs conclude that the allegedly unconstitutional directive affected every plaintiff in some manner, and that the settlement, therefore, should afford automatic relief to every plaintiff, without subjecting them to any further evaluative process. Regarding this objection, the court simply notes that the propriety of evaluating plaintiffs under the harmless error test was affirmed by the United States Court of Appeals for the Federal Circuit in *Christian v. United States,* 337 F.3d at 1349. Although not necessarily a perfect solution, allowing the Air Force an

opportunity to review the records of plaintiffs prior to a decision of whether to award such back pay is not inherently unfair, and is consistent with other requests by individuals to military and civilian agencies for back pay. Furthermore, that the proposed settlement guarantees to all plaintiffs some relief has been discussed above.

Other plaintiffs question the fairness of comparing their records to benchmark records that they allege may be forever tainted by an allegedly unconstitutional error. This argument, however, actually works in favor of finding the Board option under the Settlement Agreement fair to plaintiffs. To illustrate, assuming a less qualified minority or female officer was retained by the FY 93 RIF Board, then an officer who should have been selected for retention absent the allegedly unconstitutional Instruction, should have no difficulty scoring higher than that select benchmark record in the settlement Board selection process. Under this hypothetical, plaintiffs receive the benefit of having at least one less competitive benchmark to outscore. Because, under the settlement, that same plaintiff must only score higher than a single benchmark record, he or she would succeed more easily under the settlement Board option because the FY 93 RIF Board retained an allegedly less qualified candidate. In submissions to the court, defendant's counsel estimates that less than one quarter of plaintiffs could succeed at a harmless error Board. Moreover, the number of plaintiffs affected by the Instruction could be no more than the total number of minority and female officers selected for retention by the FY 93 RIF Board. *See id.* at 1344. Although the court does not have this information available to it, the court finds it mathematically improbable that a less qualified minority or female officer displaced every plaintiff who was selected for separation.

Another group of plaintiffs contends that because so few officers from their year group were selected for retention, there is not an adequate number of benchmark records against which to compare theirs. These objections primarily concern year groups 1980 and 1981, from which only one officer was retained for each year group, but also con- cern other year groups from which fewer than five officers were retained. Regarding year groups 1980 and 1981, defendant contends that "[t]he sole individual retained for each of those year groups was white, and the individual retained in 1981 was a white male." Plaintiffs have presented no evidence to the contrary. Thus, class members from year groups 1980 and 1981 could not demonstrate material error generated by the Instruction's racial reference if the case were litigated. Nor could the 1981 year group demonstrate material error generated by the Instruction's gender reference. Regarding the other year groups in which fewer than five officers were selected, the small number of selectees actually belies these objectors' arguments. These small numbers are a function of the year group quotas, not the references to race or gender. In the unlikely event that all of the selectees were minority or female for a particular year group, the number of plaintiffs selected for retention under a harmless error analysis conducted pursuant to AFI36–2501, Chapters 2 and 6, at maximum, could be equal to the number of officers originally retained. Moreover, the number of available slots necessarily would be reduced by the number of white males among those originally selected. *See id.* Therefore, because these plaintiffs would be required to prove material error if the case were litigated, the defendant correctly observes that, "if there were no settlement agreement, these individuals likely would receive nothing and it is an understatement to say that this agreement is to their substantial benefit." Under the settlement, the Air Force will not adhere to the year group quotas limiting the number of available retention positions. The benefit to plaintiffs of having to outscore only a single benchmark file under the settlement Board option, as opposed to having to outscore five non-select benchmark files and of having to tie at least one select benchmark file in normal AFI Board procedure, helps to resolve any issues created by the small year group quotas.

Some plaintiffs object to the settlement Board procedure because the Air Force will not release the contents of the benchmark files. Those plaintiffs argue that the unavailability of such records hinders the plaintiffs'

ability to decide in advance as to the likelihood that their records will withstand the settlement Board selection process. They also argue that they need additional time to make this decision. But according to the defendant's uncontested statement, no plaintiff requesting a Special Selection Board is ever provided the benchmark records. Moreover, plaintiffs have had access to their service records for over ten years and, as of the publication of this opinion, have known of the possibility of needing complete records for the settlement Board option for over one year. Thus, plaintiffs should have had adequate time to attempt to gather and familiarize themselves with their service records.

Some plaintiffs contend that despite diligent attempts to attain their records from the Air Force, they have been repeatedly ignored or rejected. One plaintiff described how he received his records only after repeated attempts. Moreover, the records that he received consisted of copies of the reproduced records that he had obtained upon separation from active duty. In 1996, he returned these copies to the Air Force in order to return to active service. However, because the Air Force had not retained, or could not find proper records upon his return to active service, and despite having returned copies of the records to the Air Force, he was forced to accept a six-year disparity between his official date of rank and the date that he actually attained that rank. In this unique situation, the court asked the government to review the individual's situation.

Other plaintiffs also spoke of similar problems locating their records, albeit without the additional complication of attempting to rejoin the Air Force with incomplete records. Many of these plaintiffs were told that their records were unavailable and they were understandably frustrated by the Air Force's apparent unresponsiveness to their repeated requests. These plaintiffs contend that the settlement Board option cannot be considered fair to the class as a whole if class members who wish to pursue the Board option cannot obtain their service records. The court agrees. Fortunately, this concern has been nearly alleviated because class counsel has assisted inquiring plaintiffs and has successfully obtained many of the records. On August 29, 2003, the government reported that the Air Force had located all but three sets of requested records. The court expects that defendant, through the Air Force litigation division, will continue to cooperate with class counsel in obtaining the remainder of any records requested by plaintiffs.

Other plaintiffs argue that they have their records, but those records contain errors and performance gaps. The Settlement Agreement provides in paragraph 4.c.(i) that errors may be corrected by the Air Force Board for Correction of Military Records (BCMR). Therefore, the Settlement Agreement provides a mechanism for addressing missing or erroneous records that mirrors the normal process available following litigation. In its submissions to the court, the government gave a detailed comparison of these two processes:

> Officers meeting customary selection boards are given the same access to their records and, if any errors in their records are of the sort that may be administratively corrected, the staff of their local Military Personnel Flight ("MPF") does so prior to the meeting of the selection board. The settlement agreement utilizes a similar process for records review and correction, which has proven reliable and effective for decades, except that the Air Force Personnel Center ("AFPC") staff stands in the position of the MPF staff because class members, who are no longer on active duty, will not have an MPF associated with their records. As in usual Air Force practice, the settlement agreement provides that, in the event that AFPC and the officer are unable to come to an agreement about a records correction, the officer may appeal to the BCMR, although the selection board will be held as scheduled. In usual Air Force proceedings, if the BCMR determines that a records change is merited and the change is material, it will refer the case to an SSB. Likewise, the settlement agreement provides the BCMR the authority to remand a case to a new Special Board (as opposed to an SSB). We expect the BCMR to treat record change requests submitted pursuant to the settlement agreement no differently than it cur-

rently treats record change requests submitted during its routine operations, and, in the event it finds the change to be merited and material, the BCMR will refer the case to a new Special Board.

Moreover, class counsel have reviewed individual records, and have advised individual plaintiffs with regard to the accuracy of their records. In cases in which errors were identified, class counsel recommended going directly to the Board for Correction of Military Records.

Still, the court shares some of plaintiffs' concerns regarding the records correction process under the settlement, including the settlement's lack of a provision to stay the evaluative process pending records correction. At the fairness hearing, the court articulated lingering concerns that the records correction would not happen automatically. Addressing these concerns, class counsel stated in their reply brief:

> [N]ot only does [this provision] not generally harm individuals whose records warrant correction, it actually favors them through a possible second selection opportunity for [plaintiffs whose records contain errors]. The only drawback to the provision is the fact that the period of time of constructive service for individuals who are selected for retention by a special board ends, in some circumstances, on the date on which the Secretary approves the result of the Special Board: if nothing in the agreement precluded delay the potential period of constructive service could have been extended by delaying the conduct of the Special Boards.

The government characterized the records correction procedure to be "an additional 'bite at the apple'" and, similarly to class counsel, stated that "[t]he opportunity to receive the consideration of two different Special Boards (and receive the benefits of only the best result of the two boards) must be considered advantageous." The possible two-Board records correction procedure may, in the end, benefit certain plaintiffs, although it may also prove cumbersome to those and other plaintiffs. The similarity of the two-Board records correction process to the regular records correction process used outside

of this settlement, however, is noted. In addition, subsequent to the fairness hearing, the government addressed some of the concerns raised, stating that "the Air Force intends to take actions which will demonstrate its good faith and decrease the likelihood that any individual will meet his or her first Special Board without all appropriate records corrections having first been made." Because the court has been given no reason to anticipate that the Air Force will not exercise good faith in this matter, and because the court retains jurisdiction to enforce the terms of the settlement, the court's concern over the records correction process does not prevent approval of the Settlement Agreement.

If individual records contain performance gaps, those plaintiffs also have the same solution available that would exist if plaintiffs underwent a harmless error determination pursuant to AFI 36–2501, namely, inserting correction entries which note that the absence of performance documents is not the fault of the officer being evaluated. This procedure addresses the concerns of individuals whose records do not reflect their accomplishments from their last year in service. It also addresses the objection of one particular plaintiff that his year group is disadvantaged because the Air Force postponed his year group's regular augmentation Board due to the RIF, causing his year group's files to be less complete than those of other year groups. As with the records correction procedure, this may not be a perfect solution, but it mirrors the standard procedure for correcting possible gaps in performance records.

The next set of objections relates to the mechanics of how the Boards proposed in the Settlement Agreement will operate. First, several plaintiffs lodge objections regarding the composition of the proposed Boards. Some of these plaintiffs object because the Settlement Agreement does not define how the Boards should be composed. It is true that the Settlement Agreement creates no special procedure concerning Board composition. Therefore, under paragraph 4(c)(ii) of the Settlement Agreement, the Agreement's default provision, AFI 36–2501 will govern

the makeup of the Boards. As previously discussed, using AFI 36–2501 as a default provision is unobjectionable because the Federal Circuit recently approved the AFI 36–2501, Chapter 2 board procedure. *See Haselrig v. United States*, 333 F.3d at 1356. Other plaintiffs object that officers whose records are benchmark records should not serve on the Board for that year group. This concern was resolved at the fairness hearing, and in subsequent briefing, when the government agreed not to allow an officer whose record is a select benchmark to serve on the Board for that year group.

Some plaintiffs object to the provision that calls for a single Board to review no more than ten plaintiffs' records per year group. The plaintiffs are divided on this objection, as many consider this provision to work in their favor. Counsel stated that they included the provision to benefit plaintiffs by limiting each Board's workload, thereby allowing the Boards to give more thoughtful, detailed and accelerated analysis to each file. The plaintiffs who object in this regard fail to make any convincing arguments as to how this provision prejudices them.

Some plaintiffs object to the provision that the Selection Board will not use photographs or retention recommendation forms for evaluating the plaintiffs. These plaintiffs argue that such items were included in their original evaluation, and, therefore, should be included in a reconstruction of that evaluation. Many of these plaintiffs also argue that the photographs would benefit them because they reflect decorations that they received. Similarly, some plaintiffs argue that the retention recommendation forms relay favorable information that is not otherwise available.

Class counsel stated several reasons for negotiating the exclusion of the retention recommendation forms. First, counsel notes that all of the plaintiffs were separated from service notwithstanding the presence of these documents in the original FY 93 RIF Board's determination. Moreover, according to class counsel, a properly prepared retention recommendation form should embody the actual performance documents for that plaintiff. From this, class counsel concludes that the

forms' absence should, at the very least, not harm plaintiffs. Counsel also referenced a complaint that retention recommendation forms allegedly were encoded with information used by the Air Force to surreptitiously distinguish applicants. Finally, class counsel noted that plaintiffs have the opportunity to write a letter to the Board. Any plaintiff who concludes that certain information is available only in the retention recommendation forms may include that information in his or her letter. Counsel for the government added that in the FY93 RIF, the retention recommendation forms were necessary for Boards reviewing thousands of records. But pursuant to the Settlement Agreement, a single Board will review no more than ten plaintiffs' records, plus five benchmark records, for a total of fifteen. Therefore, the main purpose behind the forms-summarizing an individual's military career-serves a far less significant function for a Board reviewing a small number of files. Counsels' rationale for excluding the retention recommendation forms is reasonable, and does not weigh against finding the settlement acceptable and fair.

Photographs also were included in the material evaluated by the FY 93 RIF Board. Photographs, however, emphasize the race and gender of each plaintiff, as well as of each benchmark selectee. Plaintiffs repeatedly state that one of their principal goals in this law suit is, as much as possible, to reconstruct the FY 93 RIF Board decision free from the consideration of race and gender. In the interests of achieving that goal, it is not inappropriate to exclude the photographs from the records before the Selection Board.

A handful of plaintiffs object that the Settlement Agreement does not enumerate objective scoring criteria. According to class counsel, these plaintiffs' statements are correct insofar as distinguishing merit, based on subjective criteria, is the task of military Selection Boards. As with other aspects of Board operations that are not specifically defined in the Settlement Agreement, the Selection Board will score the records according to AFI 36–2501, Chapter 2. Sett. Agr. ¶ 4(c)(ii). The court notes that the

Court of Appeals for the Federal Circuit approved the Selection Board procedures defined in AFI 36–2501, Chapter 2, in *Haselrig v. United States*, 333 F.3d at 1356. Thus, the scoring criteria under the Board is no more veiled than the standard AFI procedure approved by the Federal Circuit.

Finally, some plaintiffs object that even if the Board process were conducted fairly, it fails to make them whole. The court reiterates that, if the case were litigated, the court's powers are limited to remedying any unconstitutional content in the Secretary's Instruction. As plaintiffs' counsel succinctly stated:

> To the extent an individual views being made whole as having a reconstruction of a military career, the more favorable procedures provided by the special board process make individuals as whole as any process that could be ordered by this Court will ever make them whole. That doesn't mean they will be made whole, but it's as good as we can do under the laws that exist.

### Remedies Under the Board

To properly evaluate the fairness of the settlement proposal, it is necessary to balance the remedies available under the settlement Board option with those available if the case were successfully litigated. As discussed above, if plaintiffs successfully litigated the case, and then were successful under the harmless error determination, they likely would be entitled to back-pay for constructive service, minus offsets. *Skinner v. United States*, 219 Ct.Cl. at 333, 594 F.2d at 831. This court also may formulate appropriate declaratory and injunctive remedies collateral to money damages, *Craft v. United States*, 218 Ct.Cl. at 584–85, 589 F.2d at 1059; *see also Palmer v. United States*, 168 F.3d at 1314, although it is unlikely that this court could reinstate any plaintiff to active duty, except to bring him or her into financial parity, *see Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d at 771; *Crawford v. Cushman*, 531 F.2d at 1126. Moreover, if the Secretary reinstates a plaintiff to active duty, this court cannot order the Secretary to promote him, *Skinner v. United States*, 219 Ct.

Cl. at 332–33, 594 F.2d at 830, nor can it order the Secretary to assign that plaintiff to his or her desired duty, *Orloff v. Willoughby*, 345 U.S. at 94, 73 S.Ct. 534.

The remedies available under the settlement Board option aim to bring successful and deserving plaintiffs into financial parity with their situation as if they had never been separated from service. First, plaintiffs who are successful at the Selection Board attain back pay for constructive service credit. Sett. Agr. ¶ 4(i, m). Next, plaintiffs who are successful at the Selection Board then may compete in a promotion Board in order to attain the next higher pay grade. Sett. Agr. ¶ 4(h). Moreover, the settlement aims to automatically retire any successful, eligible plaintiffs. Sett. Agr. ¶ 4(i). Those who collect the largest sums under the settlement will collect them due to receiving a military retirement. Certain injunctive-type relief, namely reinstatement, also may be available to plaintiffs who otherwise meet existing Air Force eligibility criteria. Sett. Agr. ¶ 4(k-l).

Under the settlement, the Air Force voluntarily has made available an opportunity to apply for reinstatement to active duty and a mechanism to appear in front of a promotion Board. Following litigation, the court could not order reinstatement or promotion. Following successful litigation and administrative proceedings, a plaintiff still would have to apply to the Air Force for such remedies.

The most common plaintiffs' objections to the remedies available under the settlement Board option are that the settlement does not make available to all plaintiffs reinstatement to active duty, and that reinstatement is not automatic for those plaintiffs who are eligible. Plaintiffs, however, would have no better chance of attaining reinstatement if the settlement were rejected and plaintiffs further litigated the case. Under a litigated judgment, plaintiffs who were successful at the Selection Board could seek reinstatement to active duty. *Palmer v. United States*, 168 F.3d at 1314. But under cases such as *Gilligan v. Morgan*, 413 U.S. at 10, 93 S.Ct. 2440, and *Orloff v. Willoughby*, 345 U.S. at 94, 73 S.Ct. 534, this court might not have the power to grant the relief sought. Under the settlement, plaintiffs' chances of attaining re-

instatement are at least as viable as under a litigated outcome, notwithstanding the Secretary's discretion under the settlement in the decision of whether to reinstate individual plaintiffs.

Some plaintiffs object, stating that an Air Force Secretary cannot be trusted to exercise fairly his or her discretion over reinstatement. But it is fundamentally the province of the executive branch, acting through the Secretary of the Air Force, to oversee the makeup and composition of the Air Force. *Gilligan v. Morgan,* 413 U.S. at 10, 93 S.Ct. 2440; *Orloff v. Willoughby,* 345 U.S. at 94, 73 S.Ct. 534. Moreover, these plaintiffs again ignore the strong presumption of regularity that accompanies military proceedings. *See Richey v. United States,* 322 F.3d at 1326; *Porter v. United States,* 163 F.3d at 1316 (citing *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979)). No plaintiff offers any convincing evidence that the Secretary will exercise his or her discretion in an arbitrary manner, such that the Settlement Agreement should be rejected.

Other plaintiffs object that the remedies under the settlement aim to financially compensate plaintiffs and automatically retire them, contrary to their desired remedy, to be reinstated. Essentially, these plaintiffs present a variation on the argument that the Settlement Agreement fails to make them whole. According to these plaintiffs, reinstatement to active duty is the only means of making them whole. It is true that the remedies under the settlement favor financial compensation, automatic retirement and corrected retirement status, not reinstatement. It is equally true that financially compensating these plaintiffs does not resurrect their military careers. Having carefully examined the plaintiffs' objections, it is clear that nothing short of turning back the clock to 1993 and retaining these plaintiffs in active service could remedy what one plaintiff termed the "bitter taste" many officers took away from the FY 93 RIF. Again, although the settlement does not make these plaintiffs whole, it offers no less to them than the remedies that might be available after protracted litigation.

Going one step further, a handful of the plaintiffs contend not only that they should receive automatic reinstatement, but that they should then have their preference in assignments. Aside from this court having no authority to order such a remedy, as discussed above, this court should not approve a settlement agreement that contained such a provision. The military should not be allowed to negotiate away its duty to ensure national security. Giving individual service members or courts the authority to trump military discretion in duty assignments would do just that. Nothing prevents plaintiffs who are successful at the Board and who are subsequently reinstated from expressing preferences in assignments. Neither a litigation remedy nor any settlement agreement should grant them more.

A different group of plaintiffs objects because they and many of their co-plaintiffs have earned enough financially that their subsequent earnings would offset back pay for constructive service. These plaintiffs argue that they, therefore, would receive nothing under the Board option, even if retained. Nonetheless, such plaintiffs have the same two options under the Settlement Agreement that all plaintiffs are offered. Importantly, the lump-sum payment option is guaranteed to them regardless of income earned subsequent to the RIF, and may grant these plaintiffs more money than they would receive even under the most beneficial judicial outcome. The Board option, however, may be more lucrative than some of these plaintiffs calculate it to be if they are eligible for retirement benefits. If a plaintiff fails to calculate retirement income that would accompany selection under the Settlement Board option, he or she might be omitting the largest portion of his or her financial benefit from the equation. As defendant's counsel states, "the future retirement benefits and the back pay calculation is where the real money would be in this case for those who would collect large sums." Plaintiffs have class counsel available to help them evaluate which option benefits them most.

Some plaintiffs object because the settlement contains neither an apology from the Air Force nor an assignment of blame to the

Air Force. Many plaintiffs have expressed that an admission of fault is imperative to them. As one plaintiff stated, "if you were to offer a letter of apology and a dollar bill to the 600 of u[s], they would probably take it." Although the court doubts the statement's accuracy with respect to the majority of the plaintiffs, the court recognizes the strong emotional sentiment at play in the plaintiffs' case. It is difficult, however, to find a settlement unfair because the Air Force fails to apologize for implementing policies that it continues to believe are constitutional and lawful. Whether the Air Force acted unconstitutionally by including the racial and gender references in the FY 93 RIF Instruction can only be determined with heightened scrutiny analysis through further litigation. Therefore, the Air Force's failure to apologize for the actions of the FY 93 RIF Board, at this stage, does not weigh in favor of the court rejecting the proposed settlement.

Some plaintiffs raise valid questions regarding the treatment of reservists under the Board option. Specifically, they question how success under the Board option would affect their current rank because, for many of them, it is higher than their rank in the Air Force at the time of the FY 93 RIF. Additionally, these plaintiffs question how the mandatory retirement provisions affect their current reserve appointment. Class counsel, in its reply brief, gave a thorough explanation of how success under the Board option will affect reservists.

A reserve officer who returns to or is continued on active duty pursuant to the terms of this agreement will serve in his/her reserve grade if that is higher than the grade at the time of the RIF separation. In many circumstances, however, it will be necessary to conduct promotion SSBs in order to calculate the proper back pay due such an officer. If an individual is not selected by the SSBs, there is no reduction in the individual's present grade. Rather the potential back pay recovery is less than it might have been. Determining any officer's grade for retirement is a question which must be determined on a case by case application of relevant law and regulation, such as Chapter 1 Volume 7B of the Department of Defense Financial Management Regulation. The agreement also provides for exception to the retirement requirements of the settlement for reserve officers as follows ". . . except that individuals serving in any capacity in the Air Force, Air Force Reserve or the Air National Guard at the time of the approval of this agreement will have the option to receive the applicable constructive service credit and to have their military status otherwise unchanged by this Agreement."

Additionally, class counsel offered an example at the fairness hearing:

[A]n individual is a major in the reserve, winning before the special board automatically entitles him back pay less offsets . . . as a captain, but it is necessary to conduct a special board, a special selection board in order to determine if he would have been promoted to major at some earlier point in time. Perhaps he was promoted to major later in a career progression than would have happened if he had been left on active duty to begin with.

Class counsel summarized at the hearing:

[T]he purpose of the special selection boards for reserve officers is the calculation of back pay, the amount of back pay. If that individual has selected return to active duty and is qualified for doing so, he will or she will return to active duty in the grade in the reserve at the higher grade.

Class counsel's explanation satisfies the concerns as to whether the Settlement Agreement prejudices reserve officers regarding their current rank or retirement status.

A group of plaintiffs articulated objections regarding the eligibility standards required for reinstatement. The first group objects generally to the proposed settlement requiring successful plaintiffs who seek reinstatement to meet physical eligibility standards. Others object to having to meet physical eligibility standards because they have been injured or fallen ill since the time they were separated from service. Another group argues that it is unfair to impose current active duty standards on plaintiffs' reinstatement eligibility, rather than the standards in place in 1992. Finally, one objector contends that requiring successful plaintiffs to appear for

medical evaluations on their own time and at their own expense is unfair.

The settlement mandates that plaintiffs seeking reinstatement meet only the physical eligibility standards for retention, not the more onerous standard for initially attaining a commission. Sett. Agr. ¶ 4(*l* ). If these same plaintiffs had not been separated from service by the FY 93 RIF, and if they were still serving in the Air Force, they would be subject to the same physical eligibility standards mandated by the settlement. Moreover, the military must exercise professional judgment in its own composition and training in order to execute properly its duty to ensure national security. *Gilligan v. Morgan,* 413 U.S. at 10, 93 S.Ct. 2440. If the case were litigated, the court could not, and should not, order the military to ignore the applicable physical eligibility standards it has established. Therefore, the court cannot find the Settlement Agreement unfair on this basis.

There is no reason to suspend current eligibility requirements for active service in favor of those in place in 1992, considering that plaintiffs would be reinstated into the Air Force as it exists today. It is the Air Force's determination, as overseen by Congress, that these standards are necessary for current military personnel to perform the functions of their job. The court will not second guess the professional judgments of the Air Force and Congress in this matter. Finally, the medical evaluation requirement carries with it the same presumption of regularity that all military proceedings do. *See Richey v. United States,* 322 F.3d at 1326. The court expects that the Air Force will not schedule medical evaluations at arbitrary times or places. If it does, plaintiffs will have the assistance of class counsel to seek a more convenient time or location. Additionally, that those plaintiffs who seek reinstatement must bear the cost of the examination does not, in and of itself, render the Settlement Agreement unfair.

Certain plaintiffs who have been injured or fallen ill subsequent to the FY 93 RIF object that, had they never been separated, they would have received a medical retirement for their illness or injury. According to those

plaintiffs, no equivalent is available under the Board if they are not eligible for retirement based on years of service, and if they fail the physical reinstatement standards. Also, those plaintiffs argue that even if constructive service credit gives them eighteen years, and, therefore, possible sanctuary eligibility. from separation, they are not eligible to return to active service and, therefore, cannot attain retirement of any kind. Class counsel responds in its brief that the government "would not have agreed to a settlement with no physical standards and making the lessor [sic] retention standards applicable was a reasonable compromise." Although the court agrees that the retention standard was a reasonable compromise, this statement does not address plaintiffs' contention regarding the absence of a medical retirement provision. Class counsel admitted at the fairness hearing that plaintiffs in this predicament would not have any means of attaining retirement benefits under the settlement. Counsel estimates five or six individuals to be similarly situated. Although the Settlement Agreement may not address the interests of certain of these five or six plaintiffs, it is speculative whether any of the injuries or illnesses at issue would have resulted in a medical retirement benefit, even assuming the individual was on active duty at the time of the injury or illness. Those plaintiffs' cases would have been subject to normal review for retirement disability eligibility. Therefore, the absence of a direct solution in the Settlement Agreement on this issue does not bear enough weight to reject the benefits provided to the rest of the class by the settlement. "[A] fair settlement need not satisfy every concern of the plaintiff class ...." *Handschu v. Special Svcs. Div.,* 605 F.Supp. 1384, 1394 (S.D.N.Y.1985) (citations omitted), *aff'd,* 787 F.2d 828 (2d Cir.1986).

At least one plaintiff objects to paragraph 6 of the Settlement Agreement, which states:

Any injury, disease or condition which was incurred after discharge as a result of the FY 1993 RIF during a period deemed constructive service under this Agreement, will not give rise to any claim or entitlement to disability retirement or other dis-

ability compensation under chapter 61 of title 10, U.S.Code.

The plaintiff who specifically objected to this provision appeared at the fairness hearing and explained the source of his concern. He is a reservist who was recalled to active duty for Operation Enduring Freedom. While on active duty, he broke his leg in the course of jumping out of an airplane. He is concerned that paragraph 6 of the Settlement Agreement compromises his ability to obtain disability benefits. The government alleviated these concerns, both at the fairness hearing and in subsequent briefing, stating:

> [N]o individual in the circumstances of [this plaintiff] need fear that the settlement agreement would strip him of eligibility for disability benefits for injuries received while upon active duty in the reserves .... Because an individual who was injured while on active reserve duty would have his or her claim for disability arise as a result of that duty and not as a result of "constructive service" generated by the agreement, nothing within the agreement will prevent such an individual from receiving the benefits to which he or she is otherwise rightfully entitled.

With this, the government satisfied this plaintiff's and the court's concern regarding whether the Agreement compromises the legitimate disability benefits of this or any similarly situated plaintiff.

One plaintiff objects that the settlement does not provide a remedy for the pain and suffering of plaintiffs or their relatives. If the case were litigated, the court would have no authority to provide a remedy for pain and suffering. Because damages for pain and suffering are not a remedy available in military pay cases in this court, it was reasonable for the parties to exclude those damages from the Settlement Agreement.

### Stage in the Proceedings

In order to make an informed decision, "[t]he parties must have an 'adequate appreciation of the merits of the case before negotiating.'" *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d at 319 (quoting *In re General Motors Corp, Pick-Up Truck Fuel Tank Prods. Liability Litigation.*, 55 F.3d at 813). As long as the parties are familiar enough with their positions to rationally consider the merits of the case, early settlement is encouraged. *See Dawson v. United States*, 68 F.3d 886, 897 (5th Cir.1995). In *Prudential*, the court referred to "18 months of vigorous litigation," that the parties had participated in discovery and that the parties had filed and argued numerous pre-trial motions as sufficient to adequately support settlement. *See In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d at 319 (quoting *In re Prudential Ins. Co. of America Sales Practices Litigation*, 962 F.Supp. 450, 541 (D.N.J.1997)).

In this case, the parties are very familiar with their respective positions and with the merits of the litigation. They have already undergone dispositive motion practice in the trial court and an appellate proceeding. Class members have been kept apprised of the proceedings on the website and in mailings from class counsel. Their familiarity with the case weighs in favor of approving the settlement. The multiple remaining stages of litigation that await the parties prior to final resolution, if they do not settle, also weigh in favor of settlement approval. Success for plaintiffs in this court would require further proceedings on the constitutionality of the Secretary's Instruction, a harmless error analysis of each plaintiff's case by the Air Force, a subsequent review and remedy formulation by this court and possible further appeal. Thus, settlement at this time saves the plaintiffs, as well as the defendant, years of protracted litigation and accompanying litigation expenses. The stage in the litigation, therefore, weighs in favor of approving the settlement.

### Risk to Maintaining the Class

Under RCFC 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues ...." In this instance, the class was certified for two particular issues, both involving liability.

> The liability issues presented by the complaint and discussed at the oral argument are whether the Memorandum of Instruction issued by the Secretary was facially defective or not and, even if found to be

facially defective, whether or not individual plaintiffs are entitled to *per se* application of that finding to their individual case histories. Issues regarding damages will be deferred.

*Berkley v. United States,* 45 Fed.Cl. at 235. Two subsequent decisions by the United States Court of Appeals for the Federal Circuit have somewhat altered the landscape since class certification. First, the Federal Circuit in the appeal in this case held that the Secretary's Instruction contained racial and gender classifications on its face, but remanded the case for a determination of whether those facial classifications can withstand constitutional scrutiny. Furthermore, with respect to liability to individual plaintiffs, the Federal Circuit in *Christian v. United States* held that individual plaintiffs are not entitled to a *per se* application of a finding of unconstitutionality, but rather, must undergo a harmless error analysis, individually. The *Christian* decision weighs on any ultimate damages determination, because each plaintiff presents a different personnel history and, therefore, different entitlement to damages if liability is established.

In this case, there exists notable risk to the plaintiffs to maintaining this litigation as a class action at the damages stage. If plaintiffs prevail on the constitutional issue, the case will be remanded to the Air Force and each plaintiff's case will have to be reviewed individually under a harmless error test. Therefore, if plaintiffs prevail in litigation, the individualized nature of the harmless error determination dictates that the class may be decertified because it ceases to serve a purpose. Moreover, the individualized nature of possible damages owed to any plaintiffs may render maintaining a class less useful. Therefore, the risk to class maintenance weighs in favor of approving the settlement.

**Summary of Balancing**

Balancing the settlement proposal in light of the risks of litigation, the court finds the proposed settlement to be fair, reasonable and adequate. With all of the steps remaining before final resolution, upon remand, it is difficult to determine what the most likely recovery would be for any individual plaintiff if the case were to be fully litigated. Moreover, in this case, it is entirely possible that there are plaintiffs who would receive less recovery if the litigation were to be pursued, or even plaintiffs who would receive no recovery. In fact, it is possible that no plaintiff will recover if the Secretary's Instruction is found to be constitutional after heightened scrutiny review. These uncertainties pose risks to the plaintiffs. Furthermore, many of the procedural steps at the administrative level under the Settlement Agreement, although not mirror images, parallel the same procedures plaintiffs would have to undergo following successful litigation. There is no clear factor that weighs in favor of rejecting the Settlement Agreement. Most of the allegations of unfairness amount to individual plaintiff's personal concerns rather than overriding objections to fairness to the class as a whole. The court recognizes that not every plaintiff will be made whole by the settlement, and that certain plaintiffs may feel that neither their claims nor their hurt pride has been resolved. The court has identified just a handful of objections to the proposed settlement that resonate to the court as potentially unfair. As discussed above, on behalf of the Air Force, counsel for the defendant has agreed to address almost all of those issues. In fact, under the settlement terms, certain of the plaintiffs who choose the payment option, who might never survive a Selection Board, could receive what amounts to a windfall under the Settlement Agreement. Balancing all of the foregoing factors weighs in favor of the court approving the settlement, bearing in mind that the essence of a settlement is compromise in the best interests of all of the parties involved.

**Additional Plaintiffs' Objections**

In the case before the court, objections from seventy-eight class members, approximately 12 percent of the class, were received. Some plaintiffs returned multiple writings containing objections and many of the objections are duplicative in substance. The court counted approximately sixty-five separate objections. Although most of the class members' objections have been discussed above, together with the subject matter to which they relate, some of the objections cannot be

easily classified. These objections, therefore, are addressed below.

A number of plaintiffs objected that class counsel did not negotiate an opt-out provision as part of the settlement. This objection misses the mark. Although there may have been discussion during earlier proceedings of an opt-out provision, the absence of an opt-out provision does not result from class counsels' failure to negotiate one, rather it results from the rules and procedures applicable in this court. One plaintiff objects, for example, that the court's decision regarding opting out imposes a restriction on this case that does not exist in other military back pay cases. This plaintiff cites no authority to support this proposition and neither counsel nor the court can identify any authority for this proposition.

The court's May 14, 2003, order accompanying its earlier ruling addressing this subject explains that the Rules of this court do not contemplate an opt-out class. Class actions in this court are governed by RCFC 23, which is largely modeled on Federal Rule of Civil Procedure 23, but is not identical. Based on the jurisdiction of this court, the drafters of the Rules for this court contemplated certain significant differences from the Federal Rules. As stated in the Rules Committee Notes, which accompany RCFC 23:

> Because the relief available in this court is generally confined to individual money claims against the United States, the situations justifying the use of a class action are correspondingly narrower than those addressed in Fed. R Civ. P.23 .... Additionally, unlike the Federal rule, the court's rule contemplates only opt-in class certifications not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judg-

ments against the United States, and in fact that the court's injunctive powers-the typical facts of an opt-out class-are more limited than those of a district court.

The plaintiffs' objections do not provide a factual or legal reason to revisit this issue. No new concerns are raised which the court has not previously considered. Thus, plaintiffs who seek an explanation should refer to the court's ruling as documented in the transcript of the May 9, 2003 hearing and in the subsequent order dated May 14, 2003. Moreover, the functional equivalent of an opt-out provision is addressed by the settlement Board option which preserves, for those plaintiffs who chose it, the ability to further litigate their individual claims for back pay, retirement benefits and possible reinstatement. For those deserving plaintiffs who wish to pursue their individual claims and seek to establish whether they are entitled to further benefits, the Board option allows them individually to pursue such entitlement. As discussed above, if an individual plaintiff is seeking reinstatement, the Air Force, not the court, is the proper forum in which to seek reinstatement.

Some plaintiffs state that their "objections are reserved." This objection might be construed as identical to the desire of some plaintiffs to opt out, discussed immediately above. Alternately, this objection might be meant to suggest that these plaintiffs wish to reserve their right to appeal the determination of the court with regard to the settlement's fairness. The plaintiffs' right to appeal issues in the above captioned case pursuant to 28 U.S.C. § 1295 (2000) is, of course, available.[9]

Multiple plaintiffs object to any recovery under the settlement being subject to taxation. The legislature, not this court, decides

---

**9.** It is unclear whether plaintiffs' right to appeal this court's fairness determination regarding the Settlement Agreement attaches immediately upon approval of the settlement. Under 28 U.S.C. § 1295(a)(3), final decisions of this court are appealed to the United States Court of Appeals for the Federal Circuit. But a determination of fairness in this case results in a subsequent administrative process and continued trial court oversight. Because of these subsequent procedural steps, this court's fairness determina-

tion may be considered a nonfinal determination. The right to appeal under 28 U.S.C. § 1295(a)(3) attaches only after final judgment. *See* Federal Rules of Appellate Procedure (Fed. R.App. P.) 3. A discretionary interlocutory appeal, however, may be available following entry of this order pursuant to 28 U.S.C. § 1292(c)(1)(2000), upon certification by the trial court and grant of the petition for permission to appeal by the United States Court of Appeals for the Federal Circuit. *See* Fed. R.App. P. 5.

what is taxable. The court has no authority to exempt payments subject to taxation under federal or state laws, including settlement payments. Nor do the Air Force, Justice Department or individual citizens have the authority to negotiate a settlement award in which an otherwise taxable monetary component is exempt from taxation. Accordingly, these objections fail to raise cognizable concerns.

At least three plaintiffs contend that the separation or severance pay that they received as a result of the original FY 93 RIF should not offset back pay calculations. The plaintiffs who object on this basis, however, ignore binding case precedent, which indicates that:

> The source of funds involved in a back pay computation is significant. Unlike civilian earnings, which did not originate with the Government, plaintiff obtained the severance payment from the Government as an incident to his military status before the record correction was made. After the records were corrected, his constructive status is treated as though the erroneous period of separation did not exist. Plaintiff's resulting benefits and liabilities are dependent upon application of statutes and regulations that pertain to the reconstituted military status. According to the military records, plaintiff no longer qualifies for disability severance pay.

*Craft v. United States*, 218 Ct.Cl. at 600, 589 F.2d at 1068 (citations and quotations omitted). Similarly, an offset also would apply to those plaintiffs who prevailed in litigation or pursuant to the Board option, and who are otherwise eligible for backpay or retirement pursuant to applicable statutes and regulations. The purpose of constructive backpay or retirement benefits is to restore an individual to the same status regarding monetary rights to which he or she would have been entitled, but for an invalidated personnel action. *See Porter v. United States*, 163 F.3d at 1304; *Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d at 771; *Skinner v. United States*, 219 Ct.Cl. at 333, 594 F.2d at 831; *Crawford v. Cushman*, 531 F.2d at 1126. The reward for successful plaintiffs is financial parity. In this scheme, windfalls generally are not made available at taxpayers' expense. The United States Court of Appeals for the Federal Circuit has explained that:

> A service member deprived of military pay by virtue of a wrongful separation must generally mitigate his damages with any income from civilian employment. The earnings from such outside employment must be deducted from any award of back pay if he would not have received those earnings had he remained in the service.

*Groves v. United States*, 47 F.3d 1140, 1147 (Fed.Cir.1995). Finally, the court notes that offsets will not be applied to the negotiated $30,000.00 lump sum payment option, or to the $5,000.00 negotiated award for plaintiffs who choose the Board option, but are not selected for retention. The court is unpersuaded that plaintiffs' complaints about offsets provides a ground for rejection of the proposed Settlement Agreement.

At least one plaintiff requests the court, in general terms, to order a more favorable settlement than the one currently under review. As discussed above, this plaintiff ignores the case law which recognizes the proper role for the reviewing court with respect to a class action settlement agreement, which holds that a "settlement must stand or fall in its entirety." *Hanlon v. Chrysler Corp.*, 150 F.3d at 1026; *see also Evans v. Jeff D.*, 475 U.S. at 726–27, 106 S.Ct. 1531.

Some plaintiffs object to the waiver and release provisions contained in paragraphs 5 and 7 of the Settlement Agreement. Several plaintiffs object because they find the waiver provision to be generally unfair. An additional plaintiff objects because he maintains a concurrent lawsuit regarding the FY 93 RIF that he does not want to dismiss. The court requested additional discussion from the parties regarding the scope and impact of the waiver provisions.

The Agreement provides that plaintiffs, through class counsel, and the government have the right to return to this court to seek enforcement of the Settlement Agreement if either party feels that the other has breached its terms. Sett. Agr. ¶ 12. Class members who elect the Selection Board option, however, waive their right to challenge the

results or conduct of the Selection Board with regard to their individual cases, except through class counsel. Sett. Agr. ¶¶ 5, 7. Those plaintiffs also waive their right to challenge the determinations of the Air Force with regard to their eligibility to return to active duty. Sett. Agr. ¶ 5. Finally, all class members waive their right to file any subsequent legal actions, or continue any concurrently filed actions against the Air Force related to the actions of the FY 93 RIF Board. Sett. Agr. ¶ 7.

Plaintiffs understandably desire to give up as few rights as possible. But waiver provisions are often components of settlement agreements. *See, e.g., Wolff v. Cash 4 Titles,* 351 F.3d 1348, 1351 (11th Cir.2003); *Staton v. Boeing,* 327 F.3d at 961; *In the Matter of Synthroid Marketing Litigation,* 264 F.3d 712, 716 (7th Cir.2001); *Shlensky v. Dorsey,* 574 F.2d 131, 144 (3d Cir.1978). In *Staton v. Boeing,* the trial court approved a settlement agreement that included broader release and waiver provisions than those contained in the proposed settlement under review in this court. The Court of Appeals stated:

> Despite all of the foregoing concerns, we would not overturn the district court's determination to approve the settlement as fair were the release and injunctive provisions the only aspects of the decree that are troublesome. As the district court noted, plaintiffs' risk of losing the case on the merits was quite high; Boeing had an unbroken history of prevailing in discrimination cases; maintaining the class action was not a foregone conclusion; promotion decisions, a primary focus of the litigation, are largely discretionary; and discovery was likely to be extremely expensive for the plaintiffs and class counsel, whose resources are undoubtedly more limited than those of Boeing. The total monetary relief provided in the proposed settlement agreement is not insubstantial, either in total or on a pro rata basis given the number of claimants, and the balance between retrospective and prospective relief is usually one for the litigants to determine.

*Staton v. Boeing,* 327 F.3d at 962. The Court of Appeals upheld the extensive waiver provisions, given that the trial court had carefully weighed the negative aspects to the plaintiff against the risks of continued litigation. *Id.* Although the Court of Appeals in *Staton* held that the waiver provisions did not warrant disapproval of the settlement, it ultimately reversed the trial court's approval of the settlement on other grounds. *Id.* at 978.

In this instance, plaintiffs give up the right to re-litigate the actions of the FY 93 RIF Board. Unlike in *Staton,* however, plaintiffs do not give up the right to enforce the Settlement Agreement. *See id.* at 962. Furthermore, class counsel notes that the government insisted on such a waiver and release provision as a necessary component of any settlement. The government states:

> The waiver provision in Section 5 of the settlement agreement is intended to prevent the operation of the agreement from creating any additional causes of action, for example, by making constitutional challenges to the operation of the SSBs contained within the agreement. In short, while it depends upon the Government's good faith, the settlement puts an end to this litigation except for enforcement matters. It does not release the Government from its obligation to comply with the terms of the agreement or eliminate Section 12 of the settlement agreement, entitled Enforcement. This provision was of critical import to the Air Force, which, in negotiating this agreement, sought the benefits of a complete and final resolution of this litigation.

As discussed, the court has balanced the advantages of the settlement options available to plaintiffs, including the potential for deserving plaintiffs to receive constructive service credit and retirement benefits, versus the risks of litigation and the waiver provisions included in the settlement. The waiver provisions included in the settlement are a reasonable exchange for a guarantee of some recovery under the lump sum payment option and the potential for greater recovery for those plaintiffs who are successful after choosing the Board option.

One plaintiff urges that the waiver provisions render plaintiffs without recourse if the Air Force commits a host of ministerial er-

rors while implementing the Board option. The plaintiff cites as potential sources of these errors examples such as the weigh-in and the submission to the Department of Justice of a timely notice of request to return to active duty. These objections are too speculative to warrant rejecting the Settlement Agreement. In addition, the government understands that whether the settlement puts an end to this litigation, in part, "depends upon the Government's good faith." Thus, plaintiffs' ability to return to this court for enforcement of the Settlement Agreement should significantly reduce this plaintiff's concern.

One plaintiff objects to a specific waiver provision contained in paragraph 7. The provision reads: "Should any plaintiff violate any of these warranties and representations, at the sole option of the United States, any monies paid to any plaintiff as a result of this Settlement Agreement will be refunded promptly to the United States, together with interest at the rates provided by 41 U.S.C. § 611." The objector contends that if this provision is read literally, one plaintiff violating the releases provision contained in the Settlement Agreement mandates that all plaintiffs must refund their settlement to the government. Indeed, this would be a draconian result. The court, however, does not interpret paragraph 7 to mandate such a result. Rather, the court reads this provision as mandating that if "any plaintiff" violates the warranties and representations of the Agreement, then that same "any plaintiff" must refund his or her monies. Class counsel confirms that the parties intended the court's interpretation to govern. A more artfully drafted paragraph might have provided that if "any plaintiff" violates the warranties and representations, "that plaintiff" must refund his or her money as a consequence. The language in the present version of paragraph 7 is sufficient, however, to convey the proper meaning.

Plaintiffs make a variety of objections as to how and when the settlement was negotiated. One plaintiff, misunderstanding the decision of the United States Court of Appeals for the Federal Circuit, appears to contend that the settlement was negotiated "from a position of weakness" because class counsel failed to push for summary judgment. The trial court, upon consultation with the parties determines whether and when resolution by way of summary judgment is appropriate. At this stage of the proceedings, the court is not persuaded that the case, as remanded, can be resolved by summary judgment. Moreover, settlement as a form of case resolution may be appropriate at any point during the proceedings. Counsel for both parties in this case appear to have carefully weighed the pros and cons of settlement at this time, fully understanding the benefits to each side.

Another plaintiff objects because the intervening decision in *Christian v. United States*, 337 F.3d at 1338, had the potential to eviscerate one party's incentive to settle. Hindsight, however, reveals that plaintiffs received the benefit of negotiating the bulk of the Agreement before the *Christian* decision was issued. *Christian* upheld the harmless error test, an unfavorable outcome to plaintiffs in this case. One plaintiff also asserts that because Air Force Board procedure is in flux due to changing Air Force regulations, the changing regulations will render uncertain the Board procedure under the Settlement Agreement. The Settlement Agreement contemplates such concerns, however, providing that "[a]ll references to regulations and statutes herein refer to the versions of such statutes or regulations in effect on November 1, 2002, unless otherwise specified." Sett. Agr. ¶ 14.

Several plaintiffs make a series of objections based on missed future opportunities. These plaintiffs object, for instance, that the settlement makes no provision to address awards and decorations plaintiffs missed because they were not on active duty, that the settlement does not address missed opportunities for schooling in residence and that the settlement does not address Boards for obtaining regular commissions. First, whether individual plaintiffs would have received such awards, decorations and schooling opportunities is speculative. Moreover, under existing rules, regulations and procedures, such opportunities normally are considered as part of challenges to involuntary separations from

military service. The government explained its position regarding selection for schooling in residence and regular commissions:

Although the settlement agreement does not require such consideration, it is current Air Force practice to consider individuals referred to SSBs, who are favorably selected, for service schools in residence. If this practice continues during the implementation of the settlement agreement, class members will be eligible to receive its benefits. This is unlike the determination of Regular Air Force status, which is governed by the agreement. This is because success at the Major promotion board determines whether an individual is eligible for augmentation to Regular Air Force status (and, thus, selection for promotion by an SSB for Major held pursuant to the settlement agreement would do so), success at other promotion boards does not guarantee selection for service schools in residence. Thus, no provision of the settlement agreement provides for such consideration. The parties did not negotiate for such a determination because selection for a service school has no monetary impact upon an individual, and there is no statutory right to such schooling.

The court does not find that these objections, given their speculative nature, and the default Air Force procedures available to those individuals selected by the Board, merit rejecting the proposed settlement.

One plaintiff, stating that he has "been provided overall statistics for the entire board," objects that he needs additional race and gender statistics for his year group in order to make an informed decision regarding which settlement option to select. Class counsel states that this information is available and has been provided to this plaintiff. Class counsel have indicated their availability to consult with this or any other plaintiff who needs additional assistance interpreting the information that has been provided in order to decide which option best suits their personal situations.

In light of the forgoing discussions, including the discussions of plaintiffs' objections throughout the opinion, the court finds that the individual plaintiffs' objections do not warrant disapproval of the settlement.

***Class Counsels' Recommendation of the Proposal. Taking Into Account the Adequacy of Class Counsels' Representation of the Class***

■ The court reviewing a proposed settlement should "give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate." *Isby v. Bayh*, 75 F.3d at 1200; *Nat'l Treasury Employees Union v. United States*, 54 Fed.Cl. 791, 797 (2002). "A court should defer to the judgment of experienced counsel who have competently evaluated the strength of proof." *Stewart v. Rubin*, 948 F.Supp. 1077, 1087 (D.D.C.1996). Before deferring to class counsel, the court must find counsel competent based on counsels' qualifications and the court's observations of counsels' competence and effort throughout proceedings. *See Isby v. Bayh*, 75 F.3d at 1200 ("The district court relied upon affidavits outlining the qualifications of class counsel and perhaps more importantly upon its own observations over the course of the litigation as to the quality of the representation provided to the class."). The court must further determine that the settlement negotiations were not tainted by collusion. *See id.* As noted above, if satisfied as to the competence of class counsel, the court should give deference to the recommendation of the lawyers in support of the proposed settlement. *See Isby v. Bayh*, 75 F.3d at 1200; *Nat'l Treasury Employees Union v. United States*, 54 Fed.Cl. at 797.

Addressing the competence of counsel first, both Mr. Steinberg and Mr. Aileo have more than adequate legal qualifications and experience to litigate this case. Mr. Steinberg, who is counsel of record, formerly served as a personnel officer for The Judge Advocate General's Corps in the United States Army. He has reviewed many officer efficiency reports and has demonstrated a clear understanding of the procedures involved with military RIFs and Special Selection Boards, as has Mr. Aileo, Mr. Steinberg's co-counsel.

Certain class plaintiffs challenged the adequacy of their counsel during the course of

the proceedings and alleged conflicts of interest largely based on counsels' representation of other plaintiffs in cases proceeding in other courts and venues that are similar to the one before this court. These allegations were carefully reviewed by the court and discussed with all parties present, following written submissions, on several occasions. Available transcripts of the proceedings reflect the significant amount of attention devoted to the issue. That class counsel have and are contemporaneously litigating other cases similar to the one before this court weighs in favor of finding them competent. There is no evidence in the record that plaintiffs' counsel prioritized other plaintiffs or cases over the case before this court. The plaintiffs who object to class counsels' representation of other clients identify no actual conflict of interest. It is reasonable, as Mr. Steinberg suggested, that representing individuals in similar cases "enhanced counsel familiarity with the applicable law and procedures." The court had many opportunities to observe Mr. Steinberg and Mr. Aileo throughout the litigation process. Their written submissions and their in-court abilities indicate that class counsel are competent to represent the interests of the class, that they did so vigorously, and that they will continue to do so in future proceedings for those plaintiffs who choose the Board option. After review, the court finds no grounds on which to discharge or question the competence of either attorney.

The plaintiffs who contend that class counsel prioritized other cases make a variety of objections, namely that class counsel failed to ask each plaintiff's opinion with regard to the settlement, that there was inadequate communication with the class members regarding the settlement, and that counsel generally failed to address class members' individual concerns when negotiating the settlement. When posed with questions about these objections, Mr. Steinberg stated:

I solicited and received a great deal of input in [negotiating the settlement], literally thousands of messages and telephone calls back and forth on various aspects. I have listened to what people have said. Now, some may disagree and say no, you didn't listen at all, your mind was made up.

It's not a true statement. I listened. That doesn't mean I agreed with [them] because no one else has responsibility for the class as a whole .... I have crafted a settlement which I believe is in the best interest of the class as a whole. That doesn't mean that there are not objectors out there who believe that their own interests in some way have been subordinated to the class. Quite frankly, it is the nature of class action litigation.

Regarding counsels' alleged failure to consider each individual class member's input, Mr. Steinberg suggests that just the opposite is true. Class counsel developed and set up an internet site for this case on which counsel posted all court orders and posted other communications with class plaintiffs in order to keep plaintiffs informed of all aspects of the case. Through the website, class counsel also sought feedback from members of the class regarding various aspects of the case. Regarding critical aspects of the case, as well as aspects requiring class member feedback, class counsel sent separate inquiries and information to plaintiffs via regular mail in addition to posting them on the website. In discussing the input he received from class members, Mr. Steinberg stated, "[t]here is nothing in that settlement agreement, Your Honor, that was not carefully weighed, and drafted and redrafted, and Mr. Aileo and I had hours, hundreds of hours probably of consultation on how to redo things, and counterproposals back and forth with the government."

Finally, a particularly vocal group of objectors contends that class counsel failed to assist them in communicating their own negative opinions of the settlement to other class members. In fact, class counsel were acting responsibly by declining to distribute class members' personal information, given their professional duty to preserve the confidentiality of client information. Moreover, one of the plaintiffs who vocally objected set up an independent, additional website for facilitating communication and discussion between class members, thereby at least partially resolving the alleged problem. Finally, the decision regarding which settlement option most fairly compensates individual plaintiffs

is ultimately a personal one. It is dictated by individual personnel records and circumstances, not other plaintiffs' opinions. Therefore, this objection does not weigh heavily towards rejecting the settlement as a whole. After review of the record, the court is convinced that class counsel took care to communicate with members of the class, listened to suggestions from class members and included class members' concerns in their negotiation strategy leading to the proposed Settlement Agreement.

There also was discussion by certain plaintiffs that class counsel did not account for the uncertainties of the yet to be issued decision in *Christian v. United States.* Mr. Steinberg indicates that he and Mr. Aileo did account for the uncertainty injected by the pending *Christian* decision. He summarized his opinion of the settlement at the fairness hearing, in the event that the *Christian* decision were to mandate a harmless error determination, stating that he is "not at all optimistic" that many of his clients would recover anything from the government, absent this settlement.

After extensive negotiations with the government, class counsel recommended approval of the settlement. The weight of the evidence suggests that the court should give consideration to Mr. Steinberg's, Mr. Aileo's, the government's and the majority of the individual plaintiffs' endorsement of the proposed settlement.

### The Unity of the Class and the Proposed Settlement's Fairness to the Class as a Whole

■ In addressing whether the proposed settlement will fairly and "adequately protect the interests of the class," RCFC 23(a)(4), the reviewing court must first address the threshold question of whether the class is sufficiently uniform to fairly bind its members by a settlement agreement. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The United States Supreme Court has noted that class members must "possess the same interest and suffer the same injury" in order to form a sufficiently uniform class to be fairly bound by a settlement agreement. *Id.* at 625–26, 117 S.Ct. 2231 (internal quotations omitted).

Questions surrounding the uniformity of a class are often resolved at the class certification stage. *See, e.g., id.* at 612–26, 117 S.Ct. 2231; *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 307–16. In *Amchem Products,* for example, the Supreme Court denied class certification to a large group of plaintiffs seeking compensation for asbestos-related injuries and asbestos exposure. *Amchem Prods., Inc. v. Windsor,* 521 U.S. at 628–29, 117 S.Ct. 2231. In so doing, the court noted the disparity between the two categories of plaintiffs: those currently suffering from asbestos-related injuries and those who, thus far, have only the expectation of injury because of prior asbestos exposure, *id.* at 626, 117 S.Ct. 2231, as well as further differences within each category, *id.* at 628, 117 S.Ct. 2231. In addition to the lack of uniformity within the group, the Court was troubled by the likelihood that no party could sufficiently represent the class as a whole. *Id.* Thus, the Court denied class certification, noting that when " 'differences among members of a class are such that subclasses must be established . . ., adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consent[ ] . . . .' " *Id.* at 627, 117 S.Ct. 2231 (quoting *In re Joint Eastern and Southern Dist. Asbestos Litigation,* 982 F.2d 721, 742–743 (2d Cir.1992), *modified on reh'g* (1993)).

In the instant case, even though each of the class members voluntarily sought to join the class and previously requested class certification, some class members now object, alleging variations in the class. For example, several class members object to the proposed settlement on grounds that members of the class from older year groups deserve greater compensation than class members from younger year groups. Some plaintiffs object that those plaintiffs from younger year groups were not eligible for separation pay at the time and, therefore, should receive more money now. One plaintiff argues that reservists should be a sub-class. Finally, one plaintiff recognizes that not all class members were harmed by the allegedly unconstitutional Instruction, yet could receive a wind-

fall from the guaranteed payment under the proposed Settlement Agreement.

This court previously addressed the uniformity of the class in its decision granting plaintiffs' motion to certify the class, and incorporates herein the language of that opinion regarding the appropriateness of class certification. *See Berkley v. United States,* 45 Fed.Cl. at 224. The court found the core legal question of the constitutionality of the Secretary's Instruction to be central to each plaintiff's case. *Id.* at 232. The court further found that plaintiffs uniformly alleged the injuries of denial of equal protection and denial of due process. *Id.* at 233. Finally, this court found the named plaintiffs' injuries to be representative of the class as a whole, enabling the named plaintiffs to fairly represent the class. *Id.* at 233.

The question remaining with regard to fairness to the class is whether the proposed settlement is uniformly available, yet simultaneously tailored to distinct groups within the class. A settlement proposal cannot be considered fair if it fails to afford relief to a readily identifiable segment of the class. *See Petruzzi's, Inc. v. Darling–Delaware Co.,* 880 F.Supp. 292, 299–300 (M.D.Pa.1995) (rejecting class action settlement in which half of the class was ineligible for compensation). In contrast, a settlement that gives uniform relief to all class members is fair if no identifiable segment can show that factual differences entitle it to a disproportionately larger recovery. *See In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. at 347–48.

*In re Domestic Air Transportation* involved a class action suit against multiple United States-based airlines for price-fixing. Plaintiffs had originally filed multiple suits in multiple geographic jurisdictions. *Id.* at 306. The class was later certified and defined as anyone who had purchased an airline ticket from one of the defendant airlines that either departed from or arrived at that defendant's hub city. *Id.* at 307. After the class was certified, the parties entered a round of settlement negotiations, reaching an agreement that compensated class members based on the amount of class travel purchased. *Id.* at 308–09. In the settlement approval process, the Illinois plaintiffs objected to being com-

pensated at a rate equal to the rest of the class, arguing that they were entitled to greater compensation because of a fuel charge unique to Chicago. *Id.* at 345–47. Relying on the plaintiff's own expert testimony that there was a uniform overcharge across the class, the court concluded that a uniform settlement recovery was fair under the circumstances. *Id.* at 347–48.

Under the principles discussed in *In re Domestic Air Transportation,* the proposed Settlement Agreement is fair to the class as a whole. The terms of the proposed settlement offer sufficient options to address the needs of individual class members and the class as a whole. Having the choice between the Board option and the lump sum payment option gives individual plaintiffs an opportunity to assess their own situations, and the Board option offers a remedy specifically tailored to each individual plaintiff.

### *The Fairness of the Formula for Attorney Fees as Proposed in the Settlement Agreement*

■ After the parties submitted the proposed Settlement Agreement to the court for review, the court requested the parties to address the fairness to all class members of the settlement's provisions for attorney fees. As with the rest of a proposed settlement, the court must determine if the fee structure proposed is "fair, adequate, and reasonable." *Staton v. Boeing,* 327 F.3d at 959. The reviewing court also should make sure that the attorneys' interest in having the settlement approved, thereby collecting the agreed-upon fee, does not create a conflict with the class members' interest in maximizing compensation from the settlement. *See id.* at 960–61 ("[I]t will be rare that we will reverse a district court's approval of a class action consent decree unless the fees and relief provisions clearly suggest the possibility that class interests gave way to self-interest."); *Zucker v. Occidental Petroleum Corp.,* 192 F.3d 1323, 1327–28 (9th Cir.1999), *cert. denied,* 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 481 (2000).

■ In the case currently before the court, the Settlement Agreement calls for attorney fees, costs and expenses of $2,100.00

per plaintiff. Sett. Agr. ¶ 4(r). This number, $2,100.00, is 7 percent of the value of the settlement, if all plaintiffs accepted the lump sum payment option. If a significant number of plaintiffs choose the Board option, and are successful in obtaining retirement benefits, the percentage of the value of the settlement could be dramatically reduced, and the work required from plaintiffs' counsel could be significantly increased. Plaintiffs' counsel contend that the proposed settlement fee is fair, noting that, to date, they have represented the class for over five years. Additionally, class counsel notes that "[a]pproval of the settlement would leave substantial continuing representational duties on class counsel, particularly in assisting selecting plaintiffs through the special board process." Defendant also supports the proposed amount, noting that it is fair "in light of the work conducted by class counsel up until the present time and the work which we anticipate they will be required to perform after approval of the settlement . . . ."

Although the range of fee percentages in class action settlements varies widely, a seven percent attorney fee is proportionally far less than attorney fee provisions in other class action settlements that have been approved by trial courts and validated by appellate courts. Recently, the Court of Federal Claims approved a settlement that provided for 10 percent attorney fees, noting that it is "well below the typical 20–30% fee awards in class actions." *Nat'l Treasury Employees Union v. United States*, 54 Fed.Cl. at 807 (citing 1 Conte, *Attorney Fee Awards* at 50–54 (2d ed.1993); Alan Hirsch and Diane Sheehey, *Awarding Attorney Fees and Managing Fee Litigation* at 68 (1994)). In *In re SmithKline Beckman Corporation Securities Litigation*, 751 F.Supp. 525, 533 (E.D.Pa. 1990), the District Court compiled a list of approved settlements having attorney fees ranging from 19 to 45 percent of the settlement fund created. Recently, other trial courts have approved attorney fees, costs and expenses of 10 and 15 percent. *See In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 216 (D.Me.2003); *O'Keefe v. Mercedes–Benz USA. LLC*, 214 F.R.D. 266, 310 (E.D.Pa. 2003).

The majority of plaintiffs' objections regarding the fees contend either that the fee award is too high or that the government should pay the plaintiffs' attorney fees. Realistically, if individual plaintiffs were to litigate their case, each plaintiff could expect to pay far more than $2,100.00 in attorney fees, costs and expenses solely to get past the constitutional question. Moreover, to receive an award, plaintiffs would have to go through a Board selection, generating additional attorney fees if they desired an attorney's assistance with the Board process. Under the settlement, class counsel have agreed to assist plaintiffs throughout the Board selection process for no more than the $2,100.00 proposed in the Settlement Agreement.

It is not at all unusual for settlement agreements to charge fee awards to the plaintiff class. In fact, the vast majority of cases approving class action settlements charge class counsels' fee to the plaintiff class. Under the common fund exception to the prevailing rule in the United States that all parties bear their own costs in litigation, attorney fees may be subtracted from a fund created as a result of a class action settlement. *See In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. at 348.

Another objector to the attorney fee provision contends that $2,100.00 is disproportionately unfair to plaintiffs who choose the Board option yet are not selected for retention. This objection is not well taken. That they receive a $5,000.00 payment minus attorney fees is a windfall to them, since at that stage, they will have been found undeserving of retention by the Board. Considering the proportionally low fee, the amount of work already performed by class counsel and class counsels' ongoing responsibilities, especially in the case of those who choose the Board option, $2,100.00 per plaintiff is a reasonable fee and does not weigh against approving the settlement.

***The Ability of the Defendant to Withstand a Greater Judgment, Taking into Account that the Defendant is a Governmental Entity***

The ability of the defendant, in this case the United States government, to withstand

a greater judgment weighs neither in favor of nor against approving the settlement. Because legal precedent on class action settlement approvals is limited in this circuit, this court looks to the law of other circuits to determine the appropriate judicial criteria in this regard. Other Circuit Courts of Appeal have held that the defendant's ability to withstand greater judgment is relevant to a settlement's fairness. *See, e.g., In re Cendant Corp. Litigation,* 264 F.3d at 240; *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 322. The purpose behind this consideration is to determine whether defendant could withstand a judgment significantly higher than the settlement figure, assuming the case were litigated. *See In re Cendant Corp. Litigation,* 264 F.3d at 240; *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 321–22. If a higher judgment would excessively impact the company's shareholders or would jeopardize the company's survival, this factor weighs in favor of approving the settlement. *See, e.g., In re Cendant Corp. Litigation,* 264 F.3d at 240; *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d at 322.

The defendant's solvency is a minimal concern when the defendant is the federal government. In theory, the government can always withstand greater judgment because of Congress's unlimited ability to tax. *See Monell v. Dep't of Social Services of New York,* 436 U.S. 658, 676, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Talbott v. Bd. of Comm'rs of Silver Bow County,* 139 U.S. 438, 445, 11 S.Ct. 594, 35 L.Ed. 210 (1891); *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 327, 4 L.Ed. 579 (1819). On the other hand, judgments against the United States ultimately consume taxpayer dollars and deplete the United States Treasury. The court, in addition to the Department of Justice, the Department of Defense and the Air Force, has a duty to consider the source of the funds when determining the fairness of the settlement. These two competing considerations essentially cancel each other out, and both will always exist in judgments against the government. Thus, the court finds that the government's ability to withstand greater judgment has little bearing on a decision to approve or reject a proposed class action settlement in which the government is a party.

## CONCLUSION

For the reasons discussed above, the court finds the proposed Settlement Agreement between the United States and the former Air Force officers to be fair, adequate and reasonable. In so doing, the court realizes that some of the individual plaintiffs, especially the more vocal objectors, may not receive their desired remedy or may not feel they have been made whole. Each plaintiff, however, will have the ability to elect a remedy best suited to his or her own situation, thereby bringing closure to a law suit that otherwise might continue for some time to come. If the litigation were to continue, the question of whether the Secretary's Instruction fails to pass constitutional muster would require complex future proceedings. Such questions are not easily resolved. Harmless error proceedings with respect to each plaintiff would also be required. In conclusion, the court, hereby, **APPROVES** the Settlement Agreement as proposed by the parties.

**IT IS SO ORDERED.**

United States Court of Federal Claims.